## IN THE UNITED STATES DISTRICT COURT, DISTRICT OF NEBRASKA

| | |
|---|---|
| FARMERS EDGE INC., FARMERS EDGE (US) INC., and FARMERS EDGE (US) LLC, | Case No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| FARMOBILE, LLC; JASON G. TATGE; HEATH GARRET GERLOCK; and RANDALL THOMAS NUSS, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiffs Farmers Edge Inc., Farmers Edge (US) Inc., and Farmers Edge (US) LLC ("Plaintiffs"), by and through their attorneys and for their causes of action against Farmobile LLC, Jason G. Tatge, Heath Garret Gerlock, and Randall Thomas Nuss ("Defendants"), state and allege:

### I.      INTRODUCTION

1.      This is a case of reaping what others have sown.  Defendants wrongfully took the innovations, technologies, and goodwill developed by and on behalf of their former employer and Plaintiffs' predecessor-in-interest, Crop Ventures, Inc., and used Plaintiffs' own competitive advantages against them.

2.      During the last decade, the technologies and techniques of "precision agriculture" have become widely adopted in farming.  Advances in computer instrumentation of farm machinery held promise to improve efficiency and help farmers manage their fields, but in practice, they left farmers awash in a sea of data without the ability to put the volumes of data to practical use.

3.      In particular, the data was difficult to extract and centralize for the diverse variety of farm machinery.  Manufacturer-specific formats were incompatible and impaired data sharing; and the data did not reliably report what happened in the field.

4.      Ron Osborne ("Osborne"), a technology entrepreneur, ran a software company Salus Novus, Inc. ("Salus Novus") that created software platforms enabling sophisticated user interfaces for handling data flow from embedded devices.

5.      In 2011, after encountering the problems faced by farmers, Osborne came to believe that there were opportunities for use of Salus Novus's technology in precision agriculture applications.  Osborne focused an employee of Salus Novus, Defendant Heath Garret Gerlock ("Gerlock"), on the task of researching precision agriculture applications for its technology.

6.      In January 2012, Salus Novus created a company called Crop Ventures, Inc. ("Crop Ventures") to focus on its agricultural technology products.  Crop Ventures hired additional employees to work with Gerlock and Osborne, including Defendants Randall Thomas Nuss ("Nuss") and Jason G. Tatge ("Tatge"), and relied on them to commercialize and promote the agricultural technology solutions it created:  the FarmCommand system, its rugged CanPlug hardware device and its Electronic Farm Record in the cloud.

7.      The team at Crop Ventures quickly realized that the Crop Ventures technology was compelling and could be very profitable.  FarmCommand, CanPlug and the Electronic Farm Record would be first-to-market mobile and web technologies that would revolutionize collection and analysis of agricultural data.

8.      Recognizing that value, and wanting it as their own, Gerlock, Nuss, and Tatge conspired to betray Crop Ventures and quit the company in July 2013.  They then started their own company just two months later, Defendant Farmobile LLC ("Farmobile"), to compete

directly against Crop Ventures.  In doing so, they sought to exploit the market opportunity, the technology, and the connections they had acquired at, and on behalf of, Crop Ventures, and brazenly even sought to patent Crop Ventures' technology as their own.

9.     Plaintiffs subsequently acquired the interests of Salus Novus and Crop Ventures and by this action, seek to remedy the wrongdoing of the Defendants and restore Plaintiffs' exclusive right to use and market the technology innovations developed by its predecessors.

## II.     PARTIES

10.     Plaintiff Farmers Edge Inc. is a corporation organized under the laws of the province of Manitoba, Canada, with its principal place of business at 1470 Willson Place, Winnipeg, Manitoba, Canada.

11.     Plaintiff Farmers Edge (US) Inc. is a corporation organized under the laws of Minnesota with its principal place of business at Suite B, 5220 12th Avenue East, Shakopee, Minnesota.

12.     Plaintiff Farmers Edge (US) LLC is a limited liability company organized under the laws of Minnesota with its principal place of business at Suite B, 5220 12th Avenue East, Shakopee, Minnesota.  Farmers Edge LLC has a sole member:  Plaintiff Farmers Edge (US) Inc.

13.     Plaintiffs are the purchasers of and successors-in-interest to the FarmCommand technology at issue in this action, including the trade secrets, confidential information, and patent ownership interests of Crop Ventures; the patent and intellectual property rights of Salus Novus in connection with services performed for the benefit of Crop Ventures; and all contracts and agreements held by these companies related to the technology issue in this dispute.  Salus Novus assigned to Crop Ventures all right, title, and interest in its assets, tangible and intangible, relevant to the actual or potential business of Crop Ventures, including without limitation its employment contracts related to and its interests in the FarmCommand system.

3

14. Crop Ventures, having been purchased by and merged into Farmers Edge, no longer exists as a corporate entity.

15. Plaintiffs are informed and believe, and thereon allege, that Defendant Farmobile LLC is a Kansas limited liability company with its principal place of business at 7015 College Boulevard, Suite 325, Overland Park, Kansas 66211. According to the Kansas Secretary of State, the members of Farmobile LLC include Jason Tatge, a resident of Kansas, and Pandi Investments F, LLC, also located in Kansas. According to the Kansas Secretary of State, the members of Pandi Investments F, LLC are undisclosed. Farmobile's founding team is from Iowa, Nebraska, and Kansas according to the Farmobile website, https://www.farmobile.com/product/features (last visited March 18, 2016). Farmobile conducts extensive business in Nebraska, promoting its products at the Nebraska Ag Technology Association conference and advertising the fact that it has installed its products in Nebraska, such as on harvesters. *See* Farmobile, PUC Installs in Nebraska Today, Facebook.com (September 11, 2015), https://www.facebook.com/farmobilellc/posts/898420246861740.

16. Plaintiffs are informed and believe, and thereon allege, that Defendant Jason G. Tatge is an individual residing in Leawood, Kansas, with extensive business ties to Nebraska, including his work for Crop Ventures in Nebraska and promotion of Farmobile and its products in Nebraska.

17. Plaintiffs are informed and believe, and thereon allege, that Defendant Heath Garret Gerlock is an individual residing in Omaha, Nebraska.

18. Plaintiffs are informed and believe, and thereon allege, that Defendant Randall Thomas Nuss is an individual residing in Lincoln, Nebraska.

### III.   FACTS

19.   The Farm Command system (including the CanPlug and Electronic Farm Record components) conceived by Crop Ventures and Salus Novus offers innovative advances in precision agriculture and increases profits for farmers by making the best use of data from farm equipment.  Plaintiffs have continued the work of Crop Ventures and Salus Novus in developing and marketing the FarmCommand system after Farmers Edge Inc. purchased Crop Ventures in January 2015.  As described below, Plaintiffs help farmers realize the value of farm machinery data, either for analyses of their individual farms and equipment or for analyses of a broader collection of data from multiple farmers.

20.   The origin of the Farm Command system dates back to 2010 when Osborne co-founded a software company, Salus Novus.  Salus Novus developed a software platform enabling sophisticated user interfaces to be made quickly and easily.  The Salus Novus platform was particularly well-suited for embedded, Internet-connected devices that would be remotely administered and provide data as a hosted service.  In the terminology of the field, Salus Novus's software targeted the growing "Internet of Things" market that could benefit from a "cloud computing" based administration of the device or use of data from it.

21.   Salus Novus's co-founder, Osborne, soon realized that the company's platform was uniquely suited for the problems farmers faced in precision agriculture with collecting and utilizing data in an effective manner.  Although manufacturers of heavy farm machinery had begun to include computers in that machinery to collect data, those systems were often isolated instead of being integrated with more practical software and hardware systems.

22.   Recognition of this problem gave birth to Osborne's vision of the FarmCommand system.  Osborne envisioned a solution that would allow a farmer to simultaneously computerize the job and resource allocation tasks of a farm manager and capture the data generated on the

specifics of the job.  A critical component was an affordable device that could plug into any manufacturer's agriculture equipment and then wirelessly relay real-time, comprehensive performance data to farmers' mobile devices.

23.    Osborne's vision led to the FarmCommand system—a hardware and software system that collects, organizes and reports operational data (such as data about seeding, fertilizer application, spraying, harvesting, tillage, and labor) and equipment data (such as data about fuel, maintenance, and GPS location).

24.    After Salus Novus originated the vision of the FarmCommand system, Osborne formed Crop Ventures as a wholly-owned subsidary of Salus Novus to advance agricultural uses for Salus Novus technology as embodied in the FarmCommand system.

25.    The FarmCommand system included several components:  a hardware device known as the CanPlug to automate collection of data; a FarmCommand web-based application; a mobile application called Machine Command; an Application Program Interface and Software Development Kit; and data analytics functionality.

## A.    The FarmCommand Application

26.    The FarmCommand Application is a hosted (colloquially known as "cloud-based") application that allows a farmer to manage (and automatically capture data on) farm operations ("jobs") that involve field machinery.  FarmCommand enables the farmer to allocate resources to the job and remotely monitor its progress.  For instance, a farmer can allocate a particular tractor and planter to a job and a given number of bags of a specific hybrid seed.  Data captured from the actual operation of the tractor, planter, seeding rates, etc. is reported, in real-time, to the hosted FarmCommand Application where the farmer can use the data in a number of ways.

27.     A notable part of the FarmCommand Application's data capture is the centralization and aggregation of farming data into the Electronic Farm Record ("EFR").

**B.     The Electronic Farm Record**

28.     Crop Ventures conceived of the EFR as a repository and resource for the data generated from precision farming operations.  The EFR addresses a number of existing problems with farm data management.   It is automatically generated in a central, network-accessible location, which overcomes historical difficulties moving data out of the farm machinery in the field.  Farmers previously used thumb drives or even notation on paper to physically transport data from their tractors to their desks, a data challenge complicated by the incompatibility of the different proprietary data systems that different manufacturers built into the machinery.  Also, because the EFR is generated directly from operation messages of farm machinery itself, the data in it is both more accurate and more comprehensive than previous approaches.  The EFR also allows detection and reconciliation of potential errors in farm operations (for example, a farm hand spraying the wrong field).  Further, data in the EFR can be integrated so that data from different sources could provide a more comprehensive and useful view.

29.     Significantly, the farmer can share and use the data from the EFR with other business partners.  For example, data on what fields are and are not under cultivation in a given year could be easily provided for crop insurance.  Agricultural lending institutions can also be provided information on farm assets and the particular crops a farmer had in the ground.  With information on the planted crop, a farmer can provide commodities traders with information on future crop availability or reconcile contracts with yield.

**C.     The CanPlug**

30.     In order to get the data for the FarmCommand Application and EFR, Crop Ventures created a revolutionary hardware device known as the CanPlug.

31.     CanPlug is a rugged, network-enabled data recorder and transmitter for farm equipment.  Because of their increasing complexity, modern agricultural systems rely on many types of data.  For example, a tractor may rely on real-time information from wheel RPM monitors to prevent wheel slip and maintain a particular speed.  At least one on-board computer typically controls equipment operation.  A conduit known as a "data bus" provides access to the internal data generated by the machine.  But before CanPlug, farmers had difficulty getting and making good use of that data.

32.     Complexity and data-heavy reliance on computer control affect both powered machines, such as a combine or tractor, and towed implements, such as fertilizer spreaders or planters.  Towed implements typically need to communicate with the powered machinery towing them.  For example, to obtain accurate speed information a planter needs to "talk to" the tractor, with its real-time monitoring systems.

33.     Modern farm equipment includes a diagnostic port that allows access to data from the systems on the machine.  A combine may report on, for instance, fuel level, oil pressure and temperature, whether the cutting head is up or down, etc.

34.     In 2001, the International Organization for Standardization introduced the ISO 11783 standard for tractors and implements.  In North America, farm equipment producers and third party manufacturers built ISO components to attempt to connect "different colors" (different manufacturers) of farm equipment.  ISO components allowed farm machinery and implements to communicate and interoperate with each other.  For instance, a John Deere tractor towing a Case IH fertilizer spreader could provide usable speed information.  This ISO standard, known in the field as "ISOBUS," allowed the computer controls of, say, a tractor and a spreader, to communicate via the data bus running between the machinery and connected implements.

8

35.     When such equipment operates in the field, large amounts of information about the operating machinery flows on the data bus.  Before the CanPlug, this information provided little or no help to a farmer in better managing farm operations.  Much of the information was not relevant, and farmers had no convenient way to filter what was relevant.  Until Crop Ventures realized and began demonstrating the knowledge that could be derived from this data stream, and how a farmer could use that knowledge, farmers did not appreciate how valuable a source of information the prosaic data bus could be.

36.     Crop Ventures' creation of the CanPlug enabled use of this untapped data.  CanPlug connects to the data port of farm machinery and accesses the hidden mass of information flowing on the data bus.  CanPlug reads what is relevant, and wirelessly transmits that data to build the EFR.

37.     Crop Ventures conceived multiple ways to transfer data from the CanPlug to the cloud.  One approach uses Crop Ventures' application Machine Command.  In the cab of modern farm machinery, operators typically have a tablet computer.  Machine Command runs on the tablet or a smart phone.  Through Machine Command, CanPlug can communicate wirelessly with the tablet or smart phone in the cab of the farm machinery.  The Machine Command application (in addition to performing other functions, some of which are described below) can use the tablet or phone's cellular data networking to relay data from the CanPlug to the cloud.  Crop Ventures also conceived of including cellular data networking directly in the CanPlug.

38.     An important innovation was to transmit the position of the farm machinery to the FarmCommand cloud.  A GPS receiver in the CanPlug reports the equipment's instantaneous position, and data records from the CanPlug are tagged with that position information at the time FarmCommand acquires the data.

9

39. More fundamentally, Crop Ventures' EFR opened up a new world of "big data" for the farmer and others. It enables the use of farmer data in numerous potential analyses that can benefit the individual farmer. In addition, the farmer can share the data repository with equipment dealers, seed companies, crop consultants, or governmental agencies, if desired. The farmer can choose what messages, if any, to send to third parties. For example, a farmer can send alerts about machinery breakdown or maintenance needs to equipment dealers, inform current and potential suppliers about needs for seed or fertilizer, update potential buyers regarding crop progress, and run analytics after including or aggregating data from third parties. In these ways, the farmers can profit either from directly using the data to improve their own operations and equipment or from selling valuable data to third parties for their use.

**D.** **The Development of the CanPlug, FarmCommand and the EFR**

40. Ron Osborne, the co-founder of Salus Novus, founder of Crop Ventures, and Vice President of Innovation at Farmers Edge, has a background in software design and development. As noted above, Osborne saw opportunity in farming systems that made otherwise practically-unavailable data usable for growers to better manage their fields.

41. In 2011, Salus Novus wanted to promote its services more aggressively and hired additional employees to do so. In October 2011, Salus Novus hired Defendant Gerlock as a product and business channel manager. He was responsible for learning about the competitive advantages of Salus Novus and designing how to communicate those strengths through branding and an online presence.

42. Because Gerlock had access to information crucial to the company's success but that was not publicly known, Salus Novus needed to ensure that he would protect and maintain confidential and proprietary information belonging to the company. Salus Novus also needed to ensure that he would not underhandedly exploit that information to compete against the

10

company.   Accordingly, on October 3, 2011 Salus Novus and Gerlock entered into a "CONFIDENTIALITY AND NON-COMPETITION AGREEMENT."  Specifically, in the first provision of the agreement (Section 1(a)), Gerlock agreed that he "shall not disclose or use at any time any Confidential Information" of which he "is or becomes aware, whether or not such information is developed by him."  He further agreed to "take all appropriate steps to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft."  Section 7 of the agreement made clear that it applied to all of Salus Novus's subsidiaries too.  In Section 2, Gerlock also agreed that all intellectual property he generated or contributed on behalf of Salus Novus or its subsidiaries would belong to the company, not to him.  In Section 4, Gerlock also agreed not to solicit employees or customers of Salus Novus and its subsidiaries.  In particular, he agreed not to

> induce or attempt to induce any customer, supplier, licensee or other business relation of the Company to cease doing business with the Company, or in any way interfere with the relationship between any such customer, supplier, licensee or business relation and the Company (including, without limitation, making any negative statements or communications concerning the Company or any of its directors, officers, employees or affiliates)[.]

As described below, Gerlock's later betrayal of Salus Novus and Crop Ventures violated these commitments that he made in his Confidentiality and Non-Competition Agreement.

43.    When Salus Novus hired Gerlock, it had no reason to suspect Gerlock's future betrayal.  To the contrary, Salus Novus and its principal, Osborne, believed Gerlock would be a responsible and loyal employee.

44.    Crop Ventures was formed in January 2012 as a wholly-owned subsidiary of Salus Novus and immediately hired Gerlock as Executive Vice President—Business Development.  Osborne and Crop Ventures wanted someone that they thought they could trust to be an enthusiastic, creative, and loyal champion for the company.  With no reason to foresee

11

Gerlock's future disloyalty, Osborne entrusted Gerlock with overseeing many crucial aspects of Crop Ventures' strategy. Among the responsibilities in which Gerlock developed and learned the company's highly sensitive business information were setting and managing hardware and software strategy, architecting the FarmCommand ecosystem, planning feature development, testing software and hardware, and developing marketing and branding strategies.

45. In addition, from his confidential knowledge of Crop Ventures' technology, Gerlock co-authored four provisional patent applications on behalf of Crop Ventures. Gerlock also helped develop its premier CanPlug product. As described below, all of Gerlock's intimate knowledge of Crop Ventures' secrets and competitive advantages would later come back to haunt Crop Ventures for giving him its trust.

46. On or about April 30, 2012, Crop Ventures hired Defendant Nuss as an engineering contractor. One project for which Crop Ventures specifically hired Nuss was the design of the CanPlug. No other company had introduced a universal product like CanPlug for farm machinery, and Crop Ventures would have to overcome significant technical and design challenges to commercialize CanPlug with an optimal balance of features and cost. The development of CanPlug and other Crop Ventures technologies involved highly sensitive, confidential business information. Among other things, Nuss oversaw design and development of specialized hardware for interfacing agricultural machinery to wireless mobile and cloud-based platforms.

47. Crop Ventures needed to ensure that Nuss would protect and maintain confidential and proprietary information belonging to the company. Crop Ventures also needed to ensure that he would not underhandedly exploit that information to compete against the company. Accordingly, on April 30, 2012, Crop Ventures and Nuss entered into a

"CONFIDENTIALITY AND NON-COMPETITION AGREEMENT."  Specifically, in the first provision of the agreement (Section 1(a)), Nuss agreed that he "shall not disclose or use at any time any Confidential Information" of which he "is or becomes aware, whether or not such information is developed by him."  He further agreed to "take all appropriate steps to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft." In Section 2, Nuss also agreed that all intellectual property he generated or contributed on behalf of Crop Ventures would belong to the company, not to him.  In Section 4, Nuss also agreed not to solicit employees or customers of Crop Ventures.  In particular, he agreed not to:

> induce or attempt to induce any customer, supplier, licensee or other business relation of the Company to cease doing business with the Company, or in any way interfere with the relationship between any such customer, supplier, licensee or business relation and the Company (including, without limitation, making any negative statements or communications concerning the Company or any of its directors, officers, employees or affiliates)[.]

As described below, Nuss's later betrayal of Crop Ventures violated these promises that he made in his Confidentiality and Non-Competition Agreement.

48.    Over the next year after Nuss's hiring, and while Crop Ventures believed that Gerlock and Nuss were loyally working in its best interests, Crop Ventures continued to develop what would be the first-to-market mobile and web technologies to revolutionize collection and analysis of agricultural data.  Among Crop Ventures' product development efforts were FarmCommand, CanPlug, and related systems for relaying data between the CanPlug, mobile devices, and the cloud.

49.    In mid-2012, the team of Osborne, Gerlock, and Nuss had finalized concepts and implementation regarding the CanPlug, the Farm Command application and the EFR.  The team had identified what task controller would be needed and how CanPlug data in its raw form would be translated into usable data for the EFR.

13

50.     In the fall of 2012, Osborne directed employees of Crop Ventures to prepare a series of patent applications to protect its intellectual property.  In all instances, and specifically where Nuss or Gerlock contributed to conception or developed the inventions, that intellectual property is that of Plaintiffs.  Gerlock's and Nuss's agreements stated that:

> [i]n the event that [Employee], as part of [h]is activities **on behalf of the Company**, generates, authors or contributes to any invention, design, new development, device, product, method or process (whether or not patentable or reduced to practice or comprising Confidential Information), any copyrightable work (whether or not comprising Confidential Information) or any other form of Confidential Information relating directly or indirectly to the Company's business as now or hereinafter conducted (collectively, "Intellectual Property"), [Employee] acknowledges that such Intellectual Property is the exclusive property of the Company and hereby assigns all right, title and interest in and to such Intellectual Property to the Company.

51.     By February 2013, Crop Ventures had defined what its website interface for farmers would look like and how the jobs a farmer runs would be defined on the website.  The product goal of developing an EFR for the grower was nearly reached.

52.     On or about March 26, 2013, Crop Ventures filed a provisional patent application for an "Agriculture Vehicle Monitoring System" with the Patent Office.  The application, No. 61/724,998, listed as inventors:  Ron Osborne and Defendants Gerlock and Nuss, among other Crop Ventures employees.  A figure from that application is copied below.

14

FIGURE FROM CROP VENTURES PROVISIONAL APPLICATION



53.     In spring 2013, Crop Ventures had substantial momentum in developing its technology into commercially promising products.  In furtherance of preparing to take those products to market, on or about April 9, 2013, Crop Ventures hired Defendant Tatge to fill the business development role of President, a position of substantial trust.  Crop Ventures charged Tatge with, among other things, driving brand and revenue growth, penetrating financial services markets and capitalizing on those opportunities, continuing to refine internal processes and controls, and positioning the company for success.  In that capacity, Tatge had access to Plaintiffs' trade secrets and highly sensitive, confidential business information.  Crop Ventures needed to ensure that Tatge would protect and maintain confidential and proprietary information belonging to the company.  Crop Ventures also needed to ensure that he would not underhandedly exploit that information to compete against the company.  Accordingly, on April 9, 2013,  Crop Ventures and Tatge entered into an employment terms letter agreement whereby Tatge agreed not to engage in any other employment, consulting or business activity that would create a conflict of interest with Crop Ventures, and to sign Plaintiff Crop Ventures' standard Proprietary Information and Inventions Agreement.

54.     Following his hiring on or about April 9, 2013, Tatge and Osborne agreed on a ninety day plan, one element of which was to secure capital for continued growth.  Osborne and Tatge also decided how they might best divide the company's pressing tasks among them.  Tatge proposed that he work on securing financing and capital, while Osborne should work on incorporation documentation to expand the corporate board.

55.     By the end of spring 2013, the team was making excellent progress on the CanPlug, FarmCommand and the EFR.  A whiteboard drawing from May 2013 reflected the

interplay between the components and a presentation slide from April 2013 visualized the uses

for the EFR:



**Crop Ventures' Plan for the Farm Command System**



**Crop Ventures' Electronic Farm Record, from April 2013 Marketing Presentation**

56.    As Tatge began work at Crop Ventures, he was, in his own words, "building upon

what [Crop Ventures had] already built."  Crop Ventures' CanPlug hardware, FarmCommand

system and EFR were defined products with a projected market, and Tatge represented to his

colleagues at Crop Ventures that he was excited to tell the story of the EFR to the marketplace and share how Crop Ventures' hardware makes it all happen.

57.     Osborne relied on Tatge's representations that he would undertake his financing role in earnest and with undivided loyalty to Crop Ventures.  But by June of 2013, Crop Ventures had financial difficulty, and Tatge had not secured sufficient new capital.

**E.     Defendants' Wrongful Conduct**

58.     In July 2013, Gerlock, Tatge, and Nuss abandoned Crop Ventures in rapid succession.  On or about July 1, 2013, Gerlock terminated his employment with Salus Novus and Crop Ventures.  On or about July 7, 2013, Osborne notified Defendant Tatge that he had secured new capital and was ready to pay Tatge's salary in full, but the next day, Tatge terminated his employment with Crop Ventures.  On or about July 22, 2013, Defendant Nuss terminated his employment with Crop Ventures.  Because Crop Ventures was a small company, these sudden defections in business leadership and technical talent were devastating.

59.     Even more devastating were the efforts of the defectors to undermine Crop Ventures by usurping the company's technology and sources of capital.  Osborne had found a new source of capital, but that source was withdrawn on or about July 13, 2013, due to leaks of negative inside information.  In addition, in August of 2013, Tatge sent Crop Ventures investors email proposals regarding the financing of a new company, but the investors did not know that Tatge planned to use Crop Ventures' business plan and intellectual property for Tatge's new company.  In all, Tatge diverted over forty percent of the ownership interests in Crop Ventures during the fall of 2013.

60.     On information and belief, no later than September 2013, Farmobile was aggressively plotting how to use Crop Ventures' own technology to compete against it.  On or about September 5, 2013, a limited liability company named Farmobile LLC was formed in

18

Kansas.  As reported by the Kansas Secretary of State its members were Defendant Tatge, and Pandi Investments F, LLC of Kansas.

61.     Plaintiffs are informed and on that basis believe that Farmobile hired Gerlock as Director of Marketing at the beginning of September 2013, hired Nuss as Director of Engineering at the beginning of October 2013, and hired Tatge as president and CEO at the beginning of December 2013.  On information and belief, Defendants Gerlock, Nuss and Tatge were conspiring to misappropriate Plaintiffs' intellectual property prior to formally being hired by Farmobile.

62.     On or about September 23, 2013, Farmobile LLC of Bucyrus, Kansas filed two United States Provisional Patent Applications, one entitled "System and Method for Identifying Farming Operation Land Segments for a Farming Business," and one entitled "Method for Passively Extracting Operational Data from a Farming Implement."  The provisional applications named only Defendants Tatge, Gerlock and Nuss as inventors.

63.     On or about September 22, 2014, Farmobile filed a U.S. Patent Application claiming priority to the 2013 application, entitled "Farming Data Collection and Exchange System."  This application also named only Defendants Tatge, Gerlock and Nuss as inventors. The application was published in other international versions as WO 2015/042540 A1 (English and French) and CA2888742 A1 (Canadian version).  A Canadian patent has since been issued based on the application.  Farmobile's patent applications closely resembled one of the utility patent applications that Crop Ventures drafted in 2012, entitled "Vehicle-Tracking Data Interface" and naming Defendants Gerlock and Nuss, among other employees of Crop Ventures, as inventors.

64.    On February 20, 2014, a Kansas City Business Journal article reported that Defendant Farmobile had "developed a farm tracking implement that's plugged into a tractor's diagnostic port" and that "[t]he device, known as a Passive Upload Connection or 'PUC,' captures farming activity and send the data to Farmobile's cloud."  Bobby Burch, "Harvesting data:  KC-cultivated Farmobile hopes to disrupt ag model," Kansas City Business Journal (Feb. 20, 2014), http://www.bizjournals.com/kansascity/blog/bizventures-kc/2014/02/big-data-startup-farmobile.html.

65.    Farmobile LLC advertised its PUC as a "nearly indestructible" device that could upload data in real-time from farming implements to "what Farmobile terms a grower's Electronic Farm Record."  Matthew J. Grassi, "Farmobile Coming Online in 2015," CropLife, March 5, 2015.

66.    On or about March 5, 2014, Defendant Tatge presented Farmobile to entrepreneurs in Kansas City, Missouri at a "1 Million Cups" event, introducing the Farmobile PUC through which "we can place your data into what we call an "Electronic Farm Record." Kauffman1MillionCups, *1 Million Cups :: Kansas City :: Rock 360 & Farmobile LLC :: March 5, 2014*, YOUTUBE (Mar. 5, 2014), https://www.youtube.com/watch?v=dpuwNZVX0_M at 33:25.  He characterized his business model as "kind of like the Wild West because most farmers openly give away this data and they don't even realize it has value." *Id.* at 30:26-30:33.  When asked during the question and answer session following his presentation "where you're getting your technical expertise to do this kind of stuff?" Tatge replied that he did not have any partnerships with hardware technology companies, and "the fact that we've come this far in this short a time—I am surrounded by great people." *Id.* at 36:44–37:25.  He added:  "This is my

third startup and I've never moved faster or gotten more accomplished quicker due to the network of people that I'm familiar with now here in Kansas City." *Id.* at 37:31–37:40.

67.    On or about October 8, 2014, Defendant Tatge again presented Farmobile at a "1 Million Cups" event in Kansas City, Missouri, stating "our method is this:  you put the green, uh orange box in the tractor and then it goes up to the Electronic Farm Record, all the data just automatically goes up there."  Kauffman1MillionCups, *1 Million Cups :: Kansas City :: Axe Handler  &  Farmobile  ::  October  8,  2014*,  YOUTUBE  (October  8,  2014), https://www.youtube.com/watch?v=jWK1uUiafCo at 35:25-35:38.  He presented a slide that claimed Plaintiffs' methods and innovations as the "New Farmobile Method," with no mention of Crop Ventures or Farmers Edge.  He conceded, "I had never done hardware before."  *Id* at 37:13.



**Farmobile's Touting of Plaintiffs' Method as Its "New Farmobile Method"**

68.    Tatge presented the too-good-to-be-true progress that the new company had made: "last year [2013] we couldn't find a product that did it, so we decided to build our own . . . . we went from that to this in two and a half months." *Id.* at 37:10–37:25.



**Farmobile's Too-Good-To-Be-True Speedy Development of Its PUC**

*Id.* at 37:26.

69.    Defendants Tatge, Gerlock and Nuss wrongfully used the information they learned from Crop Ventures and Salus Novus for the benefit of Defendant Farmobile to create real-time data collection products and services copying Plaintiffs' products and services, including a Passive Uplink Connection product similar to Plaintiffs' CanPlug product, an Electronic Farm Record similar to Plaintiffs' Electronic Farm Record, and a Simplicity system for data collection services similar to Plaintiffs' FarmCommand.

70.     On information and belief, Defendant Tatge has wrongfully contacted and attempted to solicit investment from existing and former investors of Plaintiffs, which investors Defendant Tatge was responsible for or had contact with during his employment with Crop Ventures.

71.     On information and belief, Defendant Tatge and Defendant Farmobile have interfered with business relationships of Plaintiffs, including but not limited to supplier and go-to-market relationships.

## IV.     JURISDICTION AND VENUE

72.     The Court has personal jurisdiction over defendants pursuant to NEB. REV. STAT. §25–536 and other applicable law.  The Court may exercise personal jurisdiction over defendants because the causes of action below arise from several actions by the defendants. These actions include transacting business in this state, contracting to supply services or things in this state, and causing tortious injury by an act or omission in this state.  NEB. REV. STAT. §25–536 (1) (a)–(c).  Defendant Farmobile has beta-tested its product in Nebraska and transacted other business there.  Defendants Tatge, Nuss and Gerlock were all employed in Nebraska by Crop Ventures, Plaintiffs' predecessor.  Further, there is a cause of action arising from Defendants causing tortious injury in this state by acts outside this state, and Defendants regularly do business and solicit business in this state.  NEB. REV. STAT. §25–536 (1) (d). Further, Defendants have substantial contact with and relations to this state to afford a basis for the exercise of personal jurisdiction consistent with the Constitution of the United States.  NEB. REV. STAT. §25–536 (2).  Further, the agreement entered into by Defendant Tatge submits him to the exclusive personal jurisdiction of the federal and state courts located in Nebraska in connection with any dispute or any claim related to any dispute.

73.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum of $75,000 and is between citizens of different states or between citizens of different states and in which citizens of a foreign state are additional parties.

74.     Venue is appropriate pursuant to 28 U.S.C. § 1391(b) (2) because the events giving rise to Plaintiffs' causes of action occurred in Omaha, Nebraska at the offices of Crop Ventures and Salus Novus.

## FIRST CAUSE OF ACTION

## DEFENDANTS FARMOBILE, TATGE, GERLOCK AND NUSS

## MISAPPROPRIATION OF TRADE SECRETS

## NEB. REV. STAT. §§ 87-501 ET SEQ.

75.     Plaintiffs incorporate Paragraphs 1 through 74 above, as if fully set forth herein.

76.     Plaintiffs, including through their predecessors Salus Novus and Crop Ventures, have created trade secret information within the meaning of the Trade Secrets Act, Nebraska Revised Statutes sections 87-501 et seq.  This trade secret information includes drawings, compilations, programs, devices, methods, techniques, codes and processes regarding the FarmCommand system, CanPlug product, and Electronic Farm Record, collectively the "Information."  The Information constitutes trade secrets information because it derives economic value, both actual and potential, from not being known to, and not being ascertainable by proper means by, the public or other persons who can obtain economic value from disclosure and use.

77.     Plaintiffs' Information derives independent economic value, actual or potential, from not being known to, and not being ascertainable by proper means by other persons who can

obtain economic value from their disclosure or use. Such Information is used in Plaintiffs' business and gives Plaintiffs an advantage over competitors.

78.     Plaintiffs' trade secrets had and have economic value because they enable Plaintiffs to compete successfully against others in the marketplace and to generate interest and sales from their customers. Plaintiffs have earned a reputation for creating innovative and high-quality products. Among these products are the FarmCommand system and its components, including the CanPlug and the Electronic Farm Record. Plaintiffs rely on trade secrets that they created and own exclusively, including drawings, compilations, programs, devices, methods, techniques, codes and processes regarding feature and functionalities of Plaintiffs' current and future FarmCommand and CanPlug products, to give them an advantage in the marketplace.

79.     Plaintiffs, including their predecessors Salus Novus and Crop Ventures, have taken steps that are reasonable under the circumstances to maintain the secrecy of their trade secret information, including utilizing non-disclosure agreements as described herein and maintaining strict controls on access to that information. One of these steps has been to limit access to their trade secrets to authorized employees and prohibit employees from sharing such information with third parties not bound to maintain the confidentiality of the information. Additional steps have been to ensure that work spaces are not accessible to the general public, that computers used by employees have security protections, and that employees are aware of and acknowledge the confidentiality of the company's trade secrets. Plaintiffs, including their predecessors Salus Novus and Crop Ventures, required employees to return all company materials that contain or constitute trade secrets. Plaintiffs, Crop Ventures, and Salus Novus would never voluntarily share these trade secrets with competitors or provide competitors with

access to them. Other than the unlawful means described herein, Defendants had no practical or effective means of obtaining access to the aforementioned trade secrets.

80.     To protect their trade secrets, Plaintiffs, Crop Ventures and Salus Novus, had a continuous practice of using Non-Disclosure Agreements to protect the confidentiality of their Information when marketing themselves and their products to potential suppliers, customers and investors.

81.     Plaintiffs, Crop Ventures, and Salus Novus also consistently insisted on non-disclosure agreements for their business transactions, including:

>     a.  Confidentiality and Non-Competition Agreements with employees and contractors;
>
>     b.  Mutual Nondisclosure Agreements with companies when exploring possible business opportunities in which confidential information might be disclosed by Plaintiffs, Crop Ventures, or Salus Novus; and
>
>     c.  Confidentiality and Non-Competition Agreements with business partners.

82.     Plaintiffs, Crop Ventures, and Salus Novus consistently labeled source code and development documents as containing confidential, trade secret material, prohibiting alteration without their prior written consent.

83.     To protect trade secrets, Salus Novus entered into a Confidentiality and Non-Competition Agreement dated October 3, 2011 with Gerlock containing, among other protections for trade secrets, a Nondisclosure and Nonuse of Confidential Information clause prohibiting disclosure and use of confidential information, which included trade secrets.

84.     To protect trade secrets, Crop Ventures entered into a Confidentiality and Non-Competition Agreement dated April 30, 2012 with Nuss containing, among other protections for

trade secrets, a Nondisclosure and Nonuse of Confidential Information clause prohibiting disclosure and use of Confidential Information, which included trade secrets.

85.     To protect trade secrets, Crop Ventures also entered into an Employment Letter Agreement dated April 9, 2013 with Tatge.  As a condition of his employment, this agreement required him to execute Crop Ventures' standard Proprietary Information and Inventions Agreement.

86.     The Defendant individuals used improper means to obtain the trade secret information.  They misrepresented how they intended to use that information.  They also breached and induced breaches of their duty to maintain secrecy of the trade secret information under their employment agreements, confidentiality agreements, and duty not to use their employment to use the secrets to betray their employers.  The Defendant individuals received Plaintiffs' secrets while employed in positions of trust and confidence, making it inequitable and unjust for them to disclose the secrets to others or to use the secrets themselves to the prejudice of Plaintiffs.

87.     The Defendant individuals disclosed, at least to Farmobile, and used the trade secrets of Plaintiffs, and knew or had reason to know that their knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy and limit its use, namely under the circumstances of their employment by Plaintiffs' predecessors Salus Novus and Crop Ventures.

88.     Defendant Farmobile acquired the trade secrets of Plaintiffs from the Defendant individuals and knew or had reason to know that it was acquiring the trade secrets by improper means, including misrepresentation, breach or inducement of a breach of a duty to maintain secrecy.

89.     On information and belief, the Defendants benefited from the trade secret information obtained while in Plaintiffs' employ by using the trade secret information to produce and sell commercial products and systems for Defendant Farmobile, including the Passive Uplink Connection or PUC, the Simplicity application and system, and Farmobile's Electronic Farm Record.

90.     Defendants further benefited from the trade secret information obtained while in the employ of Plaintiffs' predecessors Salus Novus and Crop Ventures by misrepresenting the origins of the trade secret information to the public; and misrepresenting inventorship and ownership of inventions to the U.S. Patent and Trademark Office, and in international patent application processes.   These misrepresentations have resulted in commercial success for Defendant Farmobile products and the application or issuance of patents in the U.S. and abroad for inventions based on Plaintiffs' trade secret information.

91.     By virtue of the foregoing, Defendants misappropriated Plaintiffs' trade secrets to the benefit of themselves and/or Defendant Farmobile.

92.     Defendants' misappropriation and use of Plaintiffs' trade secrets were a direct and proximate cause of damages to Plaintiffs, including the loss of investors, customers, market share and ability to patent the trade secret information in the future.

93.     Pursuant to Nebraska Revised Statutes sections 87-501 et seq., Plaintiffs are entitled to recover damages, including actual loss and unjust enrichment, for Defendants' violation of the Trade Secrets Act; to injunctive relief against Defendants to prevent the actual, threatened and continued misappropriation of Plaintiffs' trade secrets, continuing for so long as the Defendants enjoy the commercial advantage created by use of the trade secrets; and to reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

## DEFENDANTS TATGE, GERLOCK AND NUSS

## BREACH OF EXPRESS AND IMPLIED CONTRACT

94.     Plaintiffs incorporate Paragraphs 1 through 93 above, as if fully set forth herein.

95.     Plaintiffs, through their predecessor-in-interest Salus Novus, and Gerlock entered into a valid and enforceable Confidentiality and Non-Competition Agreement dated October 3, 2011.

96.     Pursuant to Section 1 of Gerlock's Confidentiality and Non-Competition Agreement, entitled "Nondisclosure and Nonuse of Confidential Information," Gerlock was prohibited from using or disclosing to anyone any Confidential Information outside of the company.

97.     Pursuant to Section 2 of Gerlock's Confidentiality and Non-Competition Agreement, entitled "The Company's Ownership of Intellectual Property," in the event that Gerlock, as part of his activities on behalf of the Company, generated or contributed to any invention, design, new development, etc., Gerlock acknowledged that such intellectual property would be the exclusive property of the company.

98.     Pursuant to Section 4 of Gerlock's Confidentiality and Non-Competition Agreement, Gerlock, entitled "Nonsolicitation," Gerlock was prohibited from inducing any employee of the company to leave the employ of the company and from inducing any customer or business relation of the company to cease doing business with the company.

99.     Pursuant to Section 7 (a) Gerlock's Confidentiality and Non-Competition Agreement defined the "Company" as including all subsidiaries of Salus Novus.

100.    Pursuant to Section 7 (g) of Gerlock's Confidentiality and Non-Competition Agreement was intended to bind and inure to the benefit of the successors of Salus Novus and its subsidiaries.

101.    Gerlock acknowledged his obligation to do those things described above in paragraphs 96 through 100  by signing and executing the Confidentiality and Non-Competition Agreement.

102.    Plaintiffs, and predecessors-in-interest Salus Novus and Crop Ventures, have performed all conditions, covenants and promises required on their part to be performed in accordance with the terms and conditions of the Confidentiality and Non-Competition Agreement.

103.    As more fully set forth above, Gerlock breached Section 1 of his Confidentiality and Non-Competition Agreement by disclosing and using at Farmobile confidential information used and developed by Salus Novus or Crop Ventures, including CanPlug, EFR and FarmCommand products and services, designs, analysis, drawings, computer software, flow charts, manuals, data bases, business methods, inventions, and technology and trade secrets.

104.    As more fully set forth above, Gerlock breached Section 2 of his Confidentiality and Non-Competition Agreement, by violating Salus Novus's and Crop Ventures' rights to intellectual property, failing to protect the company's interest in inventions, new developments, products and process which Gerlock generated and contributed to as part of his activities on behalf of Salus Novus and Crop Ventures, and by claiming and assigning Plaintiffs' rights to Farmobile.

105.    As more fully set forth above, Gerlock breached Section 4 of his Confidentiality and Non-Competition Agreement by inducing Tatge and Nuss to leave the employ of the Crop

Ventures and by inducing customers and business relations to cease doing business with Crop Ventures.

106.    Plaintiffs, through their predecessor-in-interest Crop Ventures, and Nuss entered into a valid and enforceable Confidentiality and Non-Competition Agreement dated April 30, 2012.

107.    Pursuant to Section 1 of Nuss's Confidentiality and Non-Competition Agreement, entitled "Nondisclosure and Nonuse of Confidential Information," Nuss was prohibited from using or disclosing to anyone any Confidential Information outside of the company.

108.    Pursuant to Section 2 of Nuss's Confidentiality and Non-Competition Agreement, entitled "The Company's Ownership of Intellectual Property," in the event that Nuss, as part of his activities on behalf of the Company, generated or contributed to any invention, design, new development, etc., Nuss acknowledged that such intellectual property would be the exclusive property of the company.

109.    Pursuant to Section 4 of Nuss's Confidentiality and Non-Competition Agreement, entitled "Nonsolicitation," Nuss was prohibited from inducing any employee of the company to leave the employ of the company and from inducing any customer or business relation of the company to cease doing business with the company.

110.    Pursuant to Section 6 (g), Nuss's Confidentiality and Non-Competition Agreement was intended to bind and inure to the benefit of the successors of Crop Ventures.

111.    Nuss acknowledged his obligation to do those things described above in paragraphs 107 through 110  by signing and executing the Confidentiality and Non-Competition Agreement.

112. Plaintiffs, and predecessor-in-interest Crop Ventures, have performed all conditions, covenants and promises required on their part to be performed in accordance with the terms and conditions of the Confidentiality and Non-Competition Agreement.

113. As more fully set forth above, Nuss breached Section 1 of his Confidentiality and Non-Competition Agreement by disclosing and using at Farmobile confidential information used and developed by Crop Ventures, including CanPlug, EFR and FarmCommand products and services, designs, analysis, drawings, computer software, flow charts, manuals, data bases, business methods, inventions, and technology and trade secrets.

114. As more fully set forth above, Nuss breached Section 2 of his Confidentiality and Non-Competition Agreement, by violating Crop Ventures' rights to intellectual property, failing to protect Crop Ventures' interest in inventions, new developments, products and process which Nuss generated and contributed to as part of his activities on behalf of Crop Ventures, and by claiming and assigning Plaintiffs' rights to Farmobile.

115. As more fully set forth above, Nuss breached Section 4 of his Confidentiality and Non-Competition Agreement by inducing Tatge and Gerlock to leave the employ of Crop Ventures and by inducing customers and business relations to cease doing business with Crop Ventures.

116. Plaintiffs and Tatge entered into a valid and enforceable Letter Agreement dated April 9, 2013.

117. Pursuant to Section 1, Tatge's position as President was a full-time position and while rendering services to Crop Ventures, Tatge was prohibited from engaging in "any other employment, consulting or other business activity (whether full-time or part-time) that would create a conflict of interest."

32

118.    Pursuant to Section 6, Tatge could be terminated for "Cause" if he engaged in any "act of dishonesty, fraud or misrepresentation" or "breach of any confidentiality agreement or invention assignment agreement."

119.    Pursuant to Section 7, Tatge would be required as a condition of his employment to sign the "Company's standard Proprietary Information and Inventions Agreement."

120.    Pursuant to Section 10, the Letter Agreement and the Proprietary Information and Inventions Agreement constituted the complete agreement between Plaintiffs and Tatge.

121.    Tatge acknowledged his obligation to do those things described above in paragraphs 117 through 120  by signing and executing the Letter Agreement.

122.    Plaintiffs, and predecessor-in-interest Crop Ventures, have performed all conditions, covenants and promises required on their part to be performed in accordance with the terms and conditions of the Letter Agreement.

123.    By signing and executing the Letter Agreement, Tatge and Crop Ventures expressed their mutual intent to enter into the "standard Proprietary Information and Inventions Agreement."

124.    As exemplified in the agreements signed by Nuss and Gerlock, the standard Proprietary Information and Inventions Agreement at Crop Ventures would:

a.  prohibit Tatge from using or disclosing to anyone any Confidential Information outside of Crop Ventures;

b.  acknowledge that invention, design, new development, etc., generated or contributed to by Tatge as part of his activities on behalf of Crop Ventures would be the exclusive property of Crop Ventures; and

c. prohibit Tatge from inducing any employee of Crop Ventures to leave the employ of Crop Ventures and from inducing any customer or business relation of the company to cease doing business with the company.

125. It was the understanding of the Crop Ventures employees that the standard Proprietary Information and Inventions Agreement at Crop Ventures contained the provisions listed in preceding paragraph.

126. Tatge never raised any objection to the paragraph 124 provisions, nor expressed to any Crop Ventures principal any intent not to execute the standard Proprietary Information and Inventions Agreement at Crop Ventures.

127. The obligations in paragraph 124 arose from mutual agreement and intent to promise, as shown by these circumstances:

a. Tatge began employment with Crop Ventures after signing the Letter Agreement;

b. Crop Ventures observed the provisions of the Letter Agreement; and

c. Tatge acted as President of Crop Ventures from April through June of 2013.

128. As set forth more fully above, Tatge breached Section 1 of his Letter Agreement by engaging in business activity which created a conflict of interest with Plaintiffs, and directly competed with Plaintiffs, including soliciting investors of Crop Ventures, misappropriating trade secrets and intellectual property belonging to Crop Ventures, diverting distributor and other advantage business relationships from Crop Ventures, and inducing Nuss and Gerlock to leave Crop Ventures to found competitor Farmobile.

34

129.   As set forth more fully above, Tatge breached Section 6, by engaging in acts of dishonesty and fraud, and by breach of his implied confidentiality and invention assignment agreement.

130.   As set forth more fully above, Tatge breached the implied "standard Proprietary Information and Inventions Agreement."

131.   Tatge's execution of the Letter Agreement establishes through contractual estoppel the following:

    a. Tatge's intention to enter into the standard Proprietary Information and Inventions Agreement;

    b. Tatge's intention to undertake the responsibilities of the standard Proprietary Information and Inventions Agreement, including:

        i. Refraining from using or disclosing to anyone any Confidential Information outside of the company;

        ii. Acknowledging that inventions, design, new development, etc., generated or contributed to by Tatge as part of his activities on behalf of the Company would be the exclusive property of the company; and

        iii. Refraining from inducing any employee of the company to leave the employ of the company and from inducing any customer or business relation of the company to cease doing business with the company.

    c. Tatge's assumption of the responsibilities of the standard Proprietary Information and Inventions Agreement.

132. Tatge's actions and conduct during his employment at Crop Ventures further estop him from any claim that he did not intend to enter into the standard Proprietary Information and Inventions Agreement, including the following:

    a. Tatge began employment as promised in the Letter Agreement;

    b. Tatge held himself out to the public as President of Crop Ventures during his employ; and

    c. Tatge conducted himself in the workplace and with co-workers as though he had entered into and agreed to all the provisions of the Letter Agreement.

133. By virtue of the foregoing, Defendants Tatge, Gerlock and Nuss breached their agreements with Plaintiffs' predecessors Salus Novus and Crop Ventures.

134. As a result of the Defendant individuals' breach, Plaintiffs have suffered damages, which continue to accrue, in an amount to be proven at trial.

135. Plaintiffs have been damaged in the form of loss of trade, commerce, opportunity and goodwill, which are impossible to quantify.

136. Pursuant to Section 7 (i) of Gerlock's Confidentiality and Non-Competition Agreement, Gerlock's breach has materially and irreparably harmed Plaintiffs, money damages shall accordingly not be an adequate remedy, and Plaintiffs are entitled to injunctive relief in order to enforce and prevent violations of the agreement.

137. Pursuant to Section 6 (i) of Nuss's Confidentiality and Non-Competition Agreement, Nuss's breach has materially and irreparably harmed Plaintiffs, money damages shall accordingly not be an adequate remedy, and Plaintiffs are entitled to injunctive relief in order to enforce and prevent violations of the agreement.

## THIRD CAUSE OF ACTION

## DEFENDANTS TATGE, GERLOCK AND NUSS

## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

138.     Plaintiffs incorporate Paragraphs 1 through 137 above, as if fully set forth herein.

139.     In addition to the breach of contract set forth above, Gerlock, Nuss and Tatge have breached the duty of good faith and fair dealing inherent in every contract through their actions, including frustrating the purposes of their agreements with Plaintiffs' predecessors by disclosing their trade secrets and confidential information to Farmobile, using Confidential Information belonging to Salus Novus and Crop Ventures to compete with them, failing to assign inventions to Salus Novus and Crop Ventures, assigning inventions to Farmobile, and failing to name employees of Plaintiffs as co-inventors on patent applications.

140.     As more fully stated above, Gerlock and Plaintiffs' predecessor Salus Novus entered into a valid and enforceable Confidentiality and Non-Competition Agreement dated October 3, 2011.

141.     By entering into the Confidentiality and Non-Competition Agreement, Gerlock owed to Plaintiffs a duty of good faith and fair dealing.

142.     Gerlock breached the implied covenant of good faith and fair dealing by injuring the right of Plaintiffs to receive the following benefits of the Confidentiality and Non-Competition Agreement:

      a.  Gerlock would not disclose or use any Confidential Information

      b.  Gerlock would take all appropriate steps to safeguard the confidential information of his employer;

      c.  Gerlock would assign any Intellectual Property to his employer;

d.  Gerlock would cooperate to protect his employer's interests in and rights to Intellectual Property; and

e.  Gerlock would provide assistance to his employer in securing patent protection for the Intellectual Property, including executing documents for this purpose as requested after termination of employment.

143.  By providing confidential information of his employer to Farmobile and its agents, assigning inventions originated while in Salus Novus's or Crop Ventures' employ to Farmobile, and otherwise acting against the interests of Plaintiffs, Gerlock breached the implied covenant of good faith and fair dealing contained in the Confidentiality and Non-Competition Agreement.

144.  As more fully stated above, Nuss and Plaintiffs' predecessor Crop Ventures entered into a valid and enforceable Confidentiality and Non-Competition Agreement dated April 30, 2012.

145.  By entering into the Confidentiality and Non-Competition Agreement, Nuss owed to Plaintiffs a duty of good faith and fair dealing.

146.  Nuss breached the implied covenant of good faith and fair dealing by injuring the right of Plaintiffs to receive following benefits of the Confidentiality and Non-Competition Agreement:

a.  Nuss would not disclose or use Confidential Information;

b.  Nuss would take steps to safeguard the Confidential Information of his employer;

c.  Nuss would assign to his employer any intellectual property he generated or contributed to;

38

d.  Nuss would disclose to his employer all intellectual property he developed; and

e.  Nuss would cooperate with his employer to protect the Plaintiffs' interests in intellectual property.

147.  By providing confidential information of Crop Ventures to Farmobile and its agents, assigning inventions originated while in Crop Ventures' employ to Farmobile, and otherwise acting against the interests of Plaintiffs, Nuss breached the implied covenant of good faith and fair dealing contained in the Confidentiality and Non-Competition Agreement.

148.  As more fully stated above, Tatge and Plaintiffs' predecessor Crop Ventures entered into a valid and enforceable Employment Agreement dated April 9, 2013.

149.  By entering into the Employment Agreement, Tatge owed to Plaintiffs a duty of good faith and fair dealing.

150.  Tatge breached the implied covenant of good faith and fair dealing by injuring the right of Plaintiffs to receive following benefits of the Employment Agreement:

a.  Tatge would not engage in any other employment, consulting or other business opportunity that would conflict with the Plaintiffs' interests;

b.  Tatge would enter into the Proprietary Information and Inventions Agreement;

c.  Tatge would protect the confidential information of Plaintiffs;

d.  Tatge would assign any inventions to Plaintiffs; and

e.  Tatge would act in the best interests of the Plaintiffs.

151.  By providing confidential information of the Plaintiffs to Farmobile and its agents, assigning inventions originated while in Plaintiffs' predecessors' employ to Farmobile,

and otherwise acting against the interests of Plaintiffs, Tatge breached the implied covenant of good faith and fair dealing contained in the Employment Agreement.

152.   As a result of Defendants Gerlock, Nuss and Tatge's breach of the covenant of good faith and fair dealing, Plaintiffs have suffered damages, which continue to accrue, in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**

**DEFENDANTS TATGE, GERLOCK AND NUSS**

**BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY**

153.   Plaintiffs incorporate Paragraphs 1 through 152 above as if set forth fully herein.

154.   Defendant Tatge occupied a fiduciary relationship to Crop Ventures as "President," an officer of the corporation from April 9, 2013 to July 8, 2013.

155.   Defendant Tatge entered into an employment agreement dated April 9, 2013 with Crop Ventures that expressly prohibited acting against the interests of Crop Ventures:  "While you render services to the Company, you will not engage in any other employment, consulting or other business activity (whether full-time or part-time) that would create a conflict of interest with the Company."

156.   Defendant Gerlock occupied a fiduciary relationship to Salus Novus as "Product and Business Channel Manager," an officer of the corporation, and to Crop Ventures as "Executive Vice President, Products & Development," an officer of the corporation, from October 3, 2011 to July 1, 2013.

157.   Defendant Nuss occupied a fiduciary relationship to Crop Ventures as "Director of Engineering," a director of the corporation, from at least October 1, 2012 to July 22, 2013.

158. Defendants Tatge, Gerlock and Nuss breached their fiduciary duties by misappropriating corporate opportunities of Crop Ventures and Salus Novus.

159. Defendants Tatge, Gerlock and Nuss acquired, in opposition to Crop Ventures, property in which the Crop Ventures had an interest, a tangible expectancy and which was essential to the existence of Crop Ventures.

160. Defendants Tatge, Gerlock and Nuss acted in bad faith, in a manner to cause injury to and damage Crop Ventures and the marketing and development of its products FarmCommand and CanPlug, and to deprive Crop Ventures of business.

161. Defendants Tatge, Gerlock and Nuss diverted Crop Ventures investors and Crop Ventures business opportunities which were of practical advantage to Crop Ventures and fit into and furthered established corporate policies of Crop Ventures to further develop and market its product FarmCommand and CanPlug.

162. Defendants Tatge, Gerlock and Nuss occupied relationships giving rise to a duty of loyalty to Crop Ventures.

163. Defendant Tatge, Gerlock and Nuss breached their duty of loyalty to Crop Ventures by engaging in self-dealing and otherwise using their positions to further personal interests rather than those of Salus Novus (in the case of Defendant Gerlock) and Crop Ventures.

164. Defendants Tatge, Gerlock and Nuss breached their duty of loyalty by usurping Crop Ventures opportunities for personal gain, engaging in interested transactions without the approval of Crop Ventures and failing to safeguard confidential information belonging to Crop Ventures.

165.    As a result of Defendants Gerlock, Nuss and Tatge's breaches of fiduciary duty and duty of loyalty, Plaintiffs have suffered damages, which continue to accrue, in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

## DEFENDANTS FARMOBILE, TATGE, GERLOCK AND NUSS

## CONVERSION

166.    Plaintiffs incorporate Paragraphs 1 through 165 above, as if fully set forth herein.

167.    Plaintiffs are the owners of and have an absolute and unconditional right to the immediate possession of intellectual property including but not limited to the intellectual property described in the Farmobile patent application No. 20150234767 and the intellectual property that comprises the FarmCommand system, the CanPlug hardware and the EFR.

168.    Instead, Defendants have exerted unauthorized and wrongful acts of dominion over Plaintiffs' property permanently or for an indefinite period of time.

169.    Defendants' unauthorized and wrongful acts of dominion include publicly claiming ideas, concepts, plans, development and resulting products and systems as having been invented and originated by Defendants, and as being the rightful property of Defendants.  These ideas and concepts include the use of a rugged ISOBUS compatible plug-in device to passively transmit data from farm equipment to a cloud database, creating an electronic farm record accessible by the farmer and potentially by other users such as seed, equipment, and chemical dealers.  The resulting products and systems include the Passive Uplink Connection, the Simplicity system and the EFR.  These products and systems are claimed by Defendants to have been invented by the Defendant individuals while in the employ of Defendant Farmobile.

170.   Defendants' unauthorized and wrongful acts of dominion include filing patent application No. 20150234767 in the U.S.P.T.O. and companion patents abroad to claim inventions created by Plaintiffs.

171.   Defendants have wrongfully asserted numerous distinct acts of dominion over Plaintiffs' property, including:

   a.   Filing U.S. provisional patent application 61/881,320 on September 23, 2013 claiming "system and method for identifying farming operation land segments for a farming business;"

   b.   Filing U.S. provisional patent application 61/881,326 on September 23, 2013 claiming "method for passively extracting operational data from a farming implement;"

   c.   Filing U.S. patent application US20150234767A1 on September 22, 2014 claiming "Farming data collection and exchange system;"

   d.   Filing related international patent applications, including WO201504250A1, EP2901400A1, CA2888742A1, and EP2901400A4;

   e.   Assigning these applications and related applications to Farmobile;

   f.   Statements made at 1 Million Cups presentations in Kansas City, Missouri, by Defendant Tatge to an audience of entrepreneurs in which Defendant Tatge described the products and systems of Plaintiffs as being originated at and developed by Defendants during a two and a half month invention-to-market process; and

g. Statements made on Defendant Farmobile's website describing the Passive Uplink Connection, Electronic Farm Record and Simplicity application as originating at Farmobile.

172. Assignment of the U.S. application, and related patents and applications to Farmobile in violation of the terms of the individual defendants' agreements constitutes unlawful taking of Plaintiffs' intellectual property by Defendants.

173. Defendants' wrongful acts have deprived Plaintiffs permanently of the right to patent inventions belonging to Plaintiffs.

174. Defendants' wrongful acts have deprived Plaintiffs permanently of the first-to-market status of Plaintiffs' products.

175. Defendants' wrongful acts have deprived Plaintiffs permanently of the sole right to distribution of these products held by Plaintiffs in the fall of 2013, before Defendants' wrongful acts.

176. Defendants' wrongful acts have deprived Plaintiffs permanently of the right to commercialize the confidential information and trade secrets which the individual Defendants came into contact with and generated as property of Crop Ventures, and which was the subject of their confidentiality agreements.

177. As a result of Defendants' conversion of this intellectual property, Plaintiffs have suffered loss, damage, and injury, including legal expense incurred and continuing to accrue in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

## DEFENDANTS FARMOBILE, TATGE, GERLOCK, AND NUSS

## TRESPASS TO CHATTELS

178.    Plaintiffs incorporate Paragraphs 1 through 177 above, as if fully set forth herein.

179.    Plaintiffs are the possessors of chattels which are intellectual property including but not limited to the intellectual property described in the Farmobile patent application No. 20150234767 and the intellectual property that comprises the FarmCommand system, its CanPlug hardware, and its Electronic Farm Record.

180.    Defendants have dispossessed the Plaintiffs of the chattel by various acts, including but not limited to improperly filing patent applications that encompass inventions owned by Plaintiffs.  For example, on September 23, 2013, Defendants Gerlock, Nuss, and Tatge filed United States Provisional Patent Application No. 61/881,320, which encompassed one or more inventions owned by Plaintiffs.  Similarly, on September 22, 2014, Defendants Gerlock, Nuss and Tatge filed U.S. Patent Application No. 20150234767.

181.    Defendants' acts were improper and unauthorized.

182.    In filing these applications, Gerlock, Nuss and Tatge did not comply with the terms of their agreements with Plaintiffs, as described more fully above.

183.    Plaintiffs did not consent to or authorize Defendants Gerlock, Nuss and Tatge's filing of U.S. Provisional Patent Application No. 61/881,320 or U.S. Patent Application No. 20150234767 or any others.

184.    Plaintiffs did not consent to or authorize the development of Defendants' PUC, Simplicity software, or Defendants' use of the Electronic Farm Record, which utilized the

inventions and concepts originated at Crop Ventures and Salus Novus including but not limited to the FarmCommand system, its CanPlug hardware, and its Electronic Farm Record.

185.    In addition, Defendants have impaired the chattels, Plaintiffs' intellectual property comprised of the FarmCommand system, its CanPlug hardware, and its Electronic Farm Record, as to its condition, quality, or value.

186.    Defendants' acts of impairment of the chattels include but are not limited to:  in filing these patent applications, Defendants Gerlock, Nuss and Tatge intentionally and wrongfully interfered with Plaintiffs' possession and right to control the disposition of the invention subject matter, and in doing so, caused damage to Plaintiffs' intellectual property rights in the invention subject matter.  Gerlock, Nuss and Tatge's conduct constitutes a trespass to chattels.

187.    By reason of Defendants Gerlock, Nuss and Tatge's intentional misconduct in improperly filing these applications, Plaintiffs' intellectual property rights in the subject matter of the inventions have been and continue to be harmed, constituting impairment of Plaintiffs' chattels.

188.    By reason of Defendants' acts, Plaintiffs' chattels, namely its technology and products, have also been impaired as to condition, quality and value in that Plaintiffs have been denied the right to control the use and exploitation of its chattels, and to profit from bringing its unique products to market first.

189.    As a result of Gerlock, Nuss and Tatge's wrongful acts constituting trespass to chattels, Plaintiffs have suffered loss, damage, and injury, including legal expense incurred and continuing to accrue in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

## DEFENDANTS GERLOCK, NUSS AND TATGE

## CIVIL CONSPIRACY

190.    Plaintiffs incorporate Paragraphs 1 through 189 above, as if fully set forth herein.

191.    Defendant individuals Gerlock, Nuss and Tatge accomplished by concerted action an unlawful and oppressive object, or a lawful object by oppressive means.

192.    Defendant individuals conspired to convert Plaintiffs' property, trespass upon the chattels of Plaintiffs, interfere with business expectancies and relationships of Plaintiffs, and to commit other wrongful acts.

193.    On information and belief, prior to departing employment by Plaintiffs, Defendant individuals made an agreement, implied or explicit, to carry off the intellectual property assets of Crop Ventures and form their own competing company, Farmobile.

194.    The conditions and circumstances of Defendant individuals' closely coordinated defection dates in July 2013, formation of the Farmobile LLC entity in September 2013, filing of the patent applications in September 2013, and creation of a beta version product identical to that of Crop Ventures in a short two and one-half month period are evidence of Defendant individuals' civil conspiracy to deprive Plaintiffs of their business opportunities, product, and intellectual property.

195.    As a result of Gerlock, Nuss and Tatge's conspiracy to steal Plaintiffs' technology, confidential information, trade secrets, and intellectual property, Plaintiffs have suffered loss of market share and business advantage, damage, and injury, including legal expense incurred and continuing to accrue in an amount to be proven at trial.

47

**EIGHTH CAUSE OF ACTION**

**DEFENDANTS TATGE, GERLOCK AND NUSS**

**PROMISSORY ESTOPPEL**

196.　Plaintiffs incorporate Paragraphs 1 through 195 above, as if fully set forth herein.

197.　Defendant Tatge, in his Letter Agreement and in discussions with Crop Ventures, now succeeded by Plaintiffs, made a series of promises:

    a.　to enter into and observe the standard Proprietary Information and Inventions Agreement;

    b.　to maintain the secrecy of Plaintiffs' confidential information;

    c.　to protect Plaintiffs' confidential information against disclosure, misuse, espionage, loss and theft;

    d.　to assign intellectual property developed or created while in the employ of Plaintiffs to Plaintiffs;

    e.　to assist Plaintiffs in safeguarding their intellectual property; and

    f.　to assist Plaintiffs in developing and bringing to market the CanPlug, the EFR, and the FarmCommand system.

198.　Defendants Gerlock and Nuss, in their Confidentiality and Non-Competition Agreements and in discussions with Salus Novus and Crop Ventures, now succeeded by Plaintiffs, made a series of promises:

    a.　to maintain the secrecy of Plaintiffs' confidential information;

    b.　to protect Plaintiffs' confidential information against disclosure, misuse, espionage, loss and theft;

      c.   to assign intellectual property developed or created while in the employ of Plaintiffs, to Plaintiffs;

      d.   to assist Plaintiffs in safeguarding their intellectual property; and

      e.   to assist Plaintiffs in developing and bringing to market the CanPlug, the EFR, and the FarmCommand system.

199.   Defendant individuals should have reasonably expected that these promises would induce Plaintiffs to hire them and grant them full access to the confidential information and trade secrets of Plaintiffs, including information regarding plans for and development of the CanPlug, the EFR, and the FarmCommand system.

200.   Defendant individuals' promises did induce Plaintiffs to hire and employ Tatge and grant him access to confidential information and trade secrets of the company.

201.   The injustice that would result from allowing Defendant individuals to raid Plaintiffs for their intellectual property can only be avoided by enforcing Defendant individuals' promises to assign and keep confidential Plaintiffs' inventions, confidential information and trade secrets.

202.   As a result of reliance on Defendant individuals' promises, Plaintiffs have suffered loss, damage, and injury, including legal expense incurred and continuing to accrue in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

## DEFENDANTS FARMOBILE, TATGE, GERLOCK AND NUSS

## JUNKIN ACT VIOLATION

## NEB. REV. STAT. §§ 59-801 ET SEQ.

203.   Plaintiffs incorporate Paragraphs 1 through 202 above as if set forth fully herein.

204.   Defendants have engaged in restraint of trade in violation of Nebraska's Junkin Act, Nebraska Revised Statute §§ 59-801 et seq.

205.   In violation of Nebraska Revised Statute § 59-805, Defendants entered into contract and/or conspiracy, and gave direction to do acts for the purpose of driving out of business Crop Ventures.

206.   Defendants entered into an agreement and conspiracy to found the company Farmobile LLC, which would utilize the intellectual property now held by Plaintiffs.

207.   Defendants directed Farmobile and its agents to do the following acts for the purpose of driving out of business Crop Ventures:

      a.   Filing patent applications based on inventions that were owned by and originated at Crop Ventures;

      b.   Developing products including the PUC and the Simplicity system which directly copied Plaintiffs' CanPlug and FarmCommand;

      c.   Soliciting investors and customers of Crop Ventures;

      d.   Seeking out and making exclusive agreements with potential distributors of Crop Ventures products; and

      e.   Marketing products identical to those of Crop Ventures targeted to farmers in the Midwest, the customer base of Crop Ventures.

208.   Such acts were performed for the purpose of driving Crop Ventures out of business.  Plaintiffs are in possession of communications in which Defendants state the purpose of their acts to be the disruption and destruction of Plaintiffs' business.

209.   Such acts actually resulted in injury to the business of Plaintiffs in developing and bringing to market FarmCommand, the CanPlug and supporting products.

210.    Injury to the business of Plaintiffs included but was not limited to:  loss of suppliers, loss of distributors, loss of investors, and loss of market advantage in bringing a unique product to the market.

211.    As a result of Defendants' Junkin Act violations, Plaintiffs have suffered additional loss, damage, and injury, including legal expense incurred and continuing to accrue in an amount to be proven at trial.

## TENTH CAUSE OF ACTION

## DEFENDANTS FARMOBILE, TATGE, GERLOCK AND NUSS

## TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP OR EXPECTANCY

212.    Plaintiffs incorporate by reference paragraphs 1 through 211 above as if fully set forth herein.

213.    Plaintiffs, through their predecessor-in-interest Crop Ventures, had valid business relationships and expectancies which Defendants knew of.

214.    Defendants' intentional interference with these business relationships and expectancies induced a breach of the relationships.

215.    Plaintiffs' business relationships and expectancies included but were not limited to, a relationship with Exigenta in July of 2013.

216.    In July of 2013, Exigenta, a company based in Basel, Switzerland, had entered into a verbal agreement and a convertible note agreement with Crop Ventures.  The purpose of the agreement was to create cash flow to assist Crop Ventures in its payroll.

217.    As president of Crop Ventures, Defendants knew or had reason to know of Exigenta's agreement to invest in Crop Ventures.

218.    On or about July 13, 2103, Ron Osborne of Crop Ventures learned from Exigenta that the cash offer would be withdrawn based on negative internal information regarding Crop Ventures.

219.    On information and belief, Defendants influenced the Exigenta decision to withdraw its offer and were the source of the negative internal information.

220.    Defendants' acts in the Exigenta decision were improper in that Defendant individuals acquired internal information regarding Crop Ventures while in the employ of Crop Ventures, and in that Defendant Farmobile had reason to know that the information it had received regarding Crop Ventures was acquired improperly.

221.    Defendants' acts in interfering with other business relationships and expectancies were also improper.

222.    The loss of Exigenta's support created great financial difficulty for Crop Ventures, threatening the demise of the company.

223.    As a result of Defendant's tortious interference with business relationships and expectancies, Plaintiffs have suffered loss, damage, and injury, including legal expense incurred and continuing to accrue in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

## DEFENDANTS FARMOBILE, TATGE, GERLOCK AND NUSS

## DECLARATORY JUDGMENT OF OWNERSHIP

224.    Plaintiffs incorporate by reference paragraphs 1 through 223 above as if fully set forth herein.

225.    Plaintiffs are the owner of all right, title and interest in United States Patent Application No. 20150234767, and any other applications or patents that may issue based on or

claiming priority to the same, which arises out of the Defendant individuals' obligations under the terms of the Confidential and Non-Competition Agreements and implied PIIA.

226.    As such, Plaintiffs seek a declaratory judgment that Plaintiffs are the sole and exclusive owner of U.S. Patent Application No. 20150234767, and any other applications or patents that may issue based on or claiming priority to the same or, in the alternative, that it owns a pro rata undivided interest in U.S. Patent Application No. 20150234767 and any other applications or patents that may issue based on or claiming priority to the same.

<u>**REQUEST FOR JURY TRIAL AND FOR PLACE OF TRIAL**</u>

227.    Plaintiffs hereby request a trial by jury on all issues and claims so triable, pursuant to Federal Rule of Civil Procedure 38, and requests that trial be held in Omaha, Nebraska.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in their favor against Defendants Gerlock, Nuss, Tatge, and Farmobile LLC, jointly and severally, and grant the following relief:

228.    Judgment in favor of Plaintiffs and against Defendants on all causes of action alleged in this complaint;

229.    Preliminary and permanent injunctive relief restraining and enjoining Defendants, and each of their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them and having notice of this action from acquiring, using, or disclosing Plaintiffs' trade secrets, now or in the future;

230.    Preliminary and permanent injunctive relief requiring Defendants and each of their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them and having notice of this action:

    a. to deliver to Plaintiffs or this Court all property, documents, materials, or other things in Defendants' possession which embody, contain, or reference Plaintiffs' trade secrets, including but not limited to any information generated by use or reference to Plaintiffs' trade secrets; and

    b. to cause the United States Patent and Trademark Office to assign to Plaintiffs all patents and patent applications derived from Plaintiffs' trade secrets and confidential information, and/or from Inventions made by Defendant individuals while an employee of Plaintiffs and their predecessor-in-interest, Salus Novus;

231.    An order declaring that Defendant individuals hold in trust, as constructive trustees for the benefit of Plaintiffs, all profits received by them from their distribution or sale of products containing features based on or derived from Plaintiffs' trade secrets, confidential information or other intellectual property;

232.    An order directing Defendant individuals Gerlock, Nuss and Tatge to assign to Plaintiffs United States Patent Application No. 20150234767, and any other applications or patents that may issue based on or claiming priority to the same.

233.    Judgment declaring at least the following:

    a. That Defendants' purported assignment of U.S. Patent Application No. 20150234767 and any other applications or patents that may issue based on or claiming priority to the same to Farmobile is ineffective; and

   b. That Plaintiffs are the rightful owner of U.S. Patent Application No. 20150234767 and any other applications or patents that may issue based on or claiming priority to the same;

234. An award of actual, compensatory, special and consequential damages according to proof, the exact nature and extent of which may only be known after an accounting has been ordered and completed, but includes, without limitation, lost net profits, lost business sales, customer accounts, reputation and goodwill, and competitive advantage, loss of investment in the trade secrets, Defendants' unjust enrichment from the disclosure and use of such trade secrets, Defendant Farmobile LLC's sales and profits from the use of the trade secrets, legal expenses incurred to prevent Farmobile LLC's use, patenting and licensing of the Passive Uplink Connection and Simplicity software system, in an amount to be determined after an accounting and/or at trial, but in any event greater than the $75,000.00 jurisdictional requirement.

235. For an award of costs, expenses and reasonable attorneys' fees incurred by Plaintiffs in bringing and prosecuting this Complaint;

236. Prejudgment and post-judgment interest as provided by law; and

237. All such other and further relief as the Court deems just and equitable.

Dated:  April 29, 2016

FARMERS EDGE INC., FARMERS EDGE (US) INC., and FARMERS EDGE (US) LLC Plaintiffs,

By:   */s/ John P. Passarelli*
     John P. Passarelli #16018
     James M. Sulentic #19610
     Carol A. Svolos #24731
     KUTAK ROCK LLP
     1650 Farnam Street
     The Omaha Building
     Omaha, NE 68102-2186
     Telephone: (402) 346-6000
     Facsimile:  (402) 346-1148
     Email:  john.passarelli@kutakrock.com
            james.sulentic@kutakrock.com
            carol.svolos@kutakrock.com

OF COUNSEL
(*Pro hac vice* applications pending)

DARREN DONNELLY
REBECCA A.E. FEWKES
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone:  650-988-8500
Facsimile:  650-938-5200
Email: ddonnelly@fenwick.com
Email: rfewkes@fenwick.com

BRYAN KOHM
LIWEN MAH
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94114
Telephone:  415-875-2300
Facsimile:  415-281-1350
Email: bkohm@fenwick.com
Email: lmah@fenwick.com

Attorneys for Plaintiffs