IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| FARMERS EDGE INC., FARMERS EDGE (US) INC., and FARMERS EDGE (US) LLC, | **8:16CV191** |
| Plaintiffs/Counterclaim Defendants, | **MEMORANDUM AND ORDER** |
| vs. | |
| FARMOBILE, LLC, JASON G. TATGE, HEATH GARRETT GERLOCK, and RANDALL THOMAS NUSS, | |
| Defendants/ Counterclaimants. | |

This matter is before the court after a bench trial on May 23, 2018, and May 24, 2018, on a claim for attorney fees under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1835, sought by defendants/counterclaimants Farmobile, LLC, Jason G. Tatge, Heath Garrett Gerlock, and Randall Thomas Nuss (hereinafter, collectively, "Farmobile", or "the individual defendants" when referring to Tatge, Gerlock and Nuss,) from plaintiffs/counterclaim defendants Farmer's Edge Inc., Farmer's Edge (US) Inc., and Farmers Edge (US) LLC's (collectively, "FEI").

This action involves the disintegration of a business and employment relationship, alleged misuse of proprietary information, and other alleged business-related torts and defenses. United States and Canadian patents and patent law issues are tangentially involved in the dispute. The relevant background details are set forth in the court's previous orders and need not be repeated herein. *See* Filing No. 407 and Filing No. 408.

Briefly, the court granted Farmobile's motion for summary judgment on FEI's claim for misappropriation of trade secrets under the DTSA, as well as its claims under the Nebraska Trade Secrets Act ("NTSA"), Neb. Rev. Stat. § 87-504, and common law. *Farmers Edge Inc. v. Farmobile, LLC*, No. 8:16CV191, 2018 WL 2869005, at *6 (D. Neb. May 3, 2018). The court found that FEI could not maintain an action under the DTSA because FEI failed to identify any use or disclosure of the alleged trade secrets after the enactment of the DTSA in 2016. *Id.* at *5. Further, the court dismissed FEI's NTSA claim, finding that "none of the trade secrets identified by FEI are actual trade secrets under Nebraska law because the allegedly protected information was at least readily ascertainable by proper means." *Id.* The court denied FEI's cross-motion for summary judgment. Filing No. 407. Thereafter, the parties settled the remaining claims and counterclaims, except for Farmobile's DTSA claim for attorney fees. That claim was tried to the court.

Farmobile argues that FEI acted in bad faith in bringing and maintaining the DTSA action. It argues that the court has already found FEI's DTSA claim objectively specious and contends the only issue for resolution is FEI's subjective intent in bringing and continuing to maintain the claim. It asserts that FEI had either actual knowledge that its trade secret misappropriation claim had no merit at its inception or at some point further along in the litigation or was reckless in not knowing that the claim lacked merit. It argues that FEI's shifting definitions of its trade secrets are evidence of its subjective bad faith. Further, Farmobile argues that there is no continuing violation since the misappropriation occurred the day Farmobile filed its patent application. It contends

that FEI knew the misappropriation occurred more than 3 years before the DTSA was enacted.

FEI, on the other hand, contends that it had a good faith belief the Farmobile's Canadian and U.S. Patent Application disclosed and revealed Crop Ventures' trade secrets in violation of the DTSA. It contends the DTSA claim is not objectively specious because continued use of a trade secret after the date of enactment of the DTSA violates the DTSA even if the misappropriation occurred before that date. FEI also contends it acted with subjective good faith in concluding that Farmobile violated the DTSA after its enactment by filing an amendment and response to a Non-Final Office Action with the United States Patent and Trademark Office ("USPTO") in May of 2016. Further, it relies on the fact that Farmobile has not withdrawn its Canadian patent and has filed an action for infringement against FEI in Canada.

I.     FINDINGS OF FACT

FEI filed this lawsuit on April 29, 2016 and the Farmobile defendants were served with the summons and complaint on May 9, 2016. The Defend Trade Secrets Act went into effect on May 11, 2016. *See* Pub. L. 114- 153, 130 Stat. 376. On June 22, 2016, FEI amended its complaint to add a misappropriation of trade secrets claim under the DTSA. FEI alleged that Farmobile had misappropriated the trade secrets of Crop Ventures, a company that FEI had acquired. FEI also alleged that Farmobile improperly used Crop Ventures' software code. The record shows that on June 10, 2016, Farmobile filed an "Amendment and Response to Non-Final Office Action" with the USPTO that argued that the claimed invention in its U.S. Patent Application was novel,

focusing on the fact that the claimed invention was using multiple implement profiles to match and understand the data coming from the implement.

At the bench trial, Wade Barnes, the CEO of FEI, testified that he made the decision to go forward with the DTSA claim, in consultation with Ron Osborne and Chief Technical Officer Kevin Grant, though he acknowledged he did not know when the DTSA was enacted. He stated that he and Osborne talked about what was claimed in the patent, the work that had been done at Crop Ventures, and the similarities between the two. He admitted that although he was CEO, he was not "detailed around the engineering and the technical side of it" and characterized himself as the "big picture guy." Further, Barnes stated that although he did not know all the engineering details, Osborne was one-hundred percent confident that the claims in the patent were identical to things that had been worked on at Crop Ventures. He also stated that as things developed in discovery, he became more confident of FEI's position in pursuing the claim. In particular, he pointed to emails disclosed in discovery. Barnes did not recall when he was made aware of the fact that there was no evidence that FEI had copied Crop Ventures' software code.

Barnes also stated that FEI once pursued a partnership or joint venture with Farmobile, and, as part of that negotiation, had become aware in May of 2014 that Farmobile had a patent application. He also stated that the fact that precision agriculture companies had not built a telemetrics device like those involved in this litigation before then led him to believe there were trade secrets involved. He stated that at the time he acquired Crop Ventures, he was not fully aware of the fact that Crop

Ventures might have a claim against Farmobile and the individual defendants, but he thought there was something fishy about the situation.

Ron Osborne, formerly CEO of Crop Ventures and now employed as Chief Strategy officer at FEI, testified that he reviewed the complaint and amended complaint in this case before filing and reviewed responses to interrogatories during the course of the litigation. He stated that Crop Ventures was sold to FEI on January 31, 2015. He stated that no money changed hands in connection with the transaction. At the time of the acquisition, FEI was Crop Ventures' only customer.

Osborne stated he had been angry, hurt, and disappointed with Jason Tatge's departure from Crop Ventures and subsequent creation of Farmobile. He testified that he knew that Tatge had formed a new company that was competing with Crop Ventures by December of 2013. With respect to Farmobile's patent application, Osborne testified that he believed he had first seen the document in the fall of 2015 in an internal email from someone at FEI. He was asked to determine if the inventions described in the patent were conceived at Crop Ventures. He considered everything in the patent to have been developed or conceived at Crop Ventures. He stated that although the terminology was different, the concepts were the same.

Osborne testified to his background as an entrepreneur, having started several tech-related companies. He first created a company called Transmission Networking and later formed Salus-Novus, a medical data technology firm. In 2012, Heath Gerlock, then a Salus-Novus employee, proposed an ag-related implement to automate the creation of a farm record. He stated that the terminology "electronic farm" record had been used and the concept of a travel path had been discussed at Crop Ventures. He

stated Farmobile's patent application included "exactly what they had been doing at Crop Ventures—wanting to have the CAN data automatically create an implement profile inside the platform so that Crop Ventures could more intelligently record the information, display it to the farmer and feed it into the record." He stated that the information in the patent appeared to be taken from work done by Gerlock and Randy Nuss at Crop Ventures. He believed these were designs and concrete plans by Crop Ventures to achieve its business goals.

Osborne also testified that he believed the information in Farmobile's patent application contained Crop Ventures' trade secrets and he also believed that the essence of what Crop Ventures was doing was not in the public sphere at that time. He further testified that Nuss had been working on a method for mapping parameters when he left Crop Ventures. After the lawsuit was filed, Osborne became aware of an email from Randy Nuss to Tatge and Gerlock that discussed the issue.

Dr. George Edwards testified that he was retained as an expert on behalf of Farmobile to perform a software analysis and software comparison of products developed by Crop Ventures and Farmobile. He stated that at the time the individual defendants left Crop Ventures, the software and source code for the Crop Ventures product did not have the functionality to perform the functions Osborne described. Dr. Edwards further testified that the technical concepts that were identified in the report of FEI's expert, Aaron Ault, were disclosed or ascertainable from public sources of information. He also stated he is sometimes asked to do that sort of analysis in a pre-lawsuit investigation.

Jason Tatge also testified at the trial. He is presently the founder and CEO of Farmobile. He stated that while employed at Crop Ventures, he became aware that Crop Ventures' product could not do what Osborne had claimed it could do. He stated he resigned from the company with cause because he had not been paid. He remained in contact with Osborne over the summer of 2013, occasionally texting or calling Osborne about the unpaid salary. He testified he attempted to negotiate with Osborne to purchase the assets of Crop Ventures in August 2013. He testified that, at that time, Osborne told Tatge that Crop Ventures was going to sue him. Tatge testified he did not acquire the company because he was unable to see any form of books.

In late September or early October of 2013, Tatge, Heath Gerlock, and Nuss formed Farmobile. In December 2013, Farmobile disclosed to the public through its website that it was collecting and organizing data and then creating a marketplace where farmers or content providers would have the opportunity to monetize and sell their data.

Tatge stated he also spoke at events, particularly one in Saskatchewan, Canada, in December of 2013. About a week after that event, Tatge was contacted by Carl Havixbeck and Jay Kinnaird of FEI. He continued to communicate with FEI through the Spring of 2014 about becoming distribution partners. Farmobile sent FEI demo products in connection with the discussions. Farmobile's two distribution targets in Canada were Agri-Trend and FEI.

Tatge testified he met with Barnes in Winnipeg, Canada, in May 2014. Barnes and Tatge discussed Farmobile's product and Barnes stated that FEI was considering three products—a 640 Labs device, the Crop Ventures' CANPLUG and Farmobile's

PUC.  They also discussed pricing and the fact that a patent application had been filed.  Thereafter, FEI did not invest in Farmobile and later that year, announced the acquisition of Crop Ventures.

Just prior to the filing of this lawsuit, in April 2016, Farmobile had publicly announced the launch of its data store.  Before the lawsuit, FEI had not expressed concerns about either trade secrets or the patent application to Farmobile.  Tatge stated that Farmobile had not contemplated filing a patent infringement action against FEI in Canada until after FEI filed this action.  After the lawsuit was filed, Tatge became aware that FEI had filed a continuation application claiming priority back to Farmobile's patent application and naming Osborne as an inventor.

Tatge also testified to the financial and emotional impact of this lawsuit.  He stated it created stress and has affected the company's ability to hire top talent and attract investors.  On cross-examination, Tatge testified that he had instructed Gerlock and Nuss not to take any documents with them.  He became aware during discovery that Nuss had emailed someone a Crop Ventures document.  Tatge further testified that he consulted with a patent attorney and that the patent attorney helped with discovery requests.

Farmobile also submitted designated deposition testimony.  Several Crop Ventures contractors were deposed.  Antoine Kandera testified by deposition that he was a contractor who worked on a Crop Ventures project involving ISOBUS technology.  He was provided a CANPlug and testified that it did not work and was not able to gather data off of a tractor or implement.  He also testified that ISOBUS technology and task-controller technology were public information available in 2011.  He testified that

Osborne's goal was to log information provided by implements on the CANbus and Osborne needed Kandera's services to facilitate the goal because Osborne did not have a product that could do that at the time.

Benjamin Jefferson was a contractor who had access to Crop Ventures' drop box in 2013. He was involved in developing virtual terminal technology at Distek. He met with representatives of Crop Ventures in late 2012 and early 2013. He stated that many objectives that Crop Ventures wanted to accomplish were well known in the industry at that time. He testified he had access to Basecamp and a Dropbox to communicate with Crop Ventures. Distek was never paid by Crop Ventures. Jefferson also testified that a company called Hansenhof Electronics had the virtual terminal application with task controller capabilities that Crop Ventures had sought by mid-2013. He testified that Distek never provided any code to Crop Ventures and never entered into an agreement with Crop Ventures after Heath Gerlock and Randy Nuss left.

Zach Shefferd testified that he worked at Crop Ventures. He stated he has no record of ever signing a nondisclosure agreement. He stated the work he did at Crop Ventures was based on publicly available ISO standards and he used standard off the shelf electronics.

Martin Wodok is manager of research and development at OSB, a company that develops software. He stated he was first approached by Ron Osborne, who was then at Crop Ventures. Osborne wanted data logging from the ISOBUS. In September 2014, Osborne emailed him to say the CANplug did not work. OSB later fixed the hardware for the CANPlug. Brad Grier was the software engineer who worked on the project. He stated OSB wrote the software on its own and did not receive any software

from Crop Ventures. He stated OSB used the ISO standardized data. Also, Crop Ventures may have logged proprietary information from manufacturers. OSB offered Osborne an opportunity to license a data logger/task controller product and Crop Ventures did not accept the offer. He later worked with FEI on its CANPlug product.

Wodok also stated that the notion of using a task controller and virtual terminal to facilitate logging data was known to him before he was contacted by Crop Ventures. He was also familiar with the concept of filtering messages prior to working for Crop Ventures. He did not remember using any Crop Ventures code and stated he used C++ programming language.

Anita Wortzman testified to circumstances surrounding the acquisition of Crop Ventures by FEI. She is an attorney who represents FEI in the capacity of outside general counsel. She stated she didn't "dig into" Crop Ventures' intellectual property at the time. She testified that Crop Ventures' investors wound up with 425,000 shares of FEI. The valuation of Crop Ventures was based on a negotiation. Lori Robidoux testified to the valuation of FEI and stated it currently has 72 million shares outstanding.

Curtis MacKinnon testified by deposition that he was one of the founders of FEI. Beginning in December 2013 and extending into early 2014, Farmobile and FEI discussed a potential business relationship wherein FEI would become a distribution partner of Farmobile. He stated that FEI did not pursue a business arrangement with Farmobile because the company was not the right fit—that is, Tatge's valuation was high and the business model of selling data did not align with FEI's objectives. He stated he had seen a Farmobile CANPlug but did not see it operate. MacKinnon

testified he met Tatge in Winnipeg in 2014 and stated that the fact that Tatge had worked for Ron Osborne raised concerns.

Kevin Grant is Chief Technology Officer at FEI. His company, GranDuke, was acquired by FEI in January 2015. Prior to that, GranDuke was a contractor preparing crop maps and crop analytics for FEI. He stated that the foundation for what is now FEI's FarmCommand product began at GranDuke. Further, he stated that the FarmCommand software that had been used at Crop Ventures is now in use at FEI. He also testified that CANPlug 1 was initially launched after Crop Ventures was acquired by FEI and that hardware improvements have been made since that time.

Patrick Crampton is the Chief Operating Officer (COO) at FEI. He testified that prior to becoming COO he was the Chief Product Officer and was responsible for product development. He stated that Farmobile is a competitor in the area of telemetrics. He identified a patent assignment from Salus Novus.

Farmobile contractors also testified by deposition. Eric Brown is employed by Iotopia Solutions. He worked on a Farmobile project and had a mutual nondisclosure agreement. He created software code for Farmobile. He stated that neither Heath Gerlock, Jason Tatge nor Randy Nuss told him what code to write for the project.

Martin Bures is the founder of ThoughtSynth. He testified he was approached by NimbeLink, on behalf of Farmobile, to produce software that would take data off the CANbus and retain it and send it over a cellular link to the cloud. He stated that Nuss provided him with some loose specifications of data formats—specifying the server format, the format for talking to the cloud, and the data that Farmobile was interested in taking from the CANbus. Bures drafted the code without any help from Nuss, Heath

Gerlock or Tatge. He stated he used Python software language and identified and described an initial system architecture diagram for the PUC device. He testified he used an open source protocol, open source software, and a standard LINUX utility toolset. He stated it took over a year to develop the product for Farmobile. He was not aware of that NimbeLink had done any work for Crop Ventures.

Scott Schwalbe is cofounder of NimbeLink, a company that provides engineering services for hardware design and development. He worked with CANbus on a number of projects with a number of companies. NimbeLink designs board support software packages integrated with the hardware that are unique to each client. He first started working with Farmobile in December of 2013. Farmobile hired NimbeLink to design a product to connect to combines and track data out of combines. He stated there were certain standard components one uses to send messages to the cloud from a CANbus. NimbeLink designed the hardware for the PUC with NimbeLink's patented Skywire modem and selected the contract manufacturer.

He testified that Farmobile did not provide NimbeLink any schematics of product designs that had belonged to Crop Ventures. NimbeLink used standard commands added to the firmware and Farmobile did not direct the tasks related to the product development timeline. He also stated he had been approached by Crop Ventures in the summer of 2014 to solve some problems. He also testified that NimbeLink signed a nondisclosure agreement with Crop Ventures. He stated a schematic of the project was typical of product proposals. He stated the ultimate PUC project did not match the schematic. Further, he testified that the Farmobile employees told him their product would be unique in its go-to-market strategy. He stated it took three months to get the

Farmobile product to manufacturing. Kurt Larson is employed at NimbeLink. He testified that no one at Farmobile ever provided him with software code or documents. He also stated the CAN message protocols are industry standards.

II. CONCLUSIONS OF LAW

A. Law

The DTSA creates a federal private right of action for "[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836. The DTSA includes definitions, remedies, and a statute of limitations substantially similar to provisions in the Uniform Trade Secrets Act ("UTSA"). *See* H. Rep. No. 114-529, at 4-5, 12-14 (2016), *as reprinted in* 2016 U.S.C.C.A.N. 195-211. Although the UTSA is effective in 48 states, those laws "vary in a number of ways and contain built-in limitations that make them not wholly effective in a national and global economy." *Id.* at 4. The DTSA is intended to provide a "single, national standard for trade secret misappropriation with clear rules and predictability for everyone involved." *Id.* Under the DTSA, prohibited "misappropriation" includes both the acquisition of a trade secret and its disclosure. 18 U.S.C. § 1839(5)(A)-(B).

"The requirement under Rule 54(d)(2) of an independent source of authority for an award of attorneys' fees gives effect to the 'American Rule' that each party must bear its own attorneys' fees in the absence of a rule, statute, or contract authorizing such an award." *MRO Commc'ns., Inc. v. AT & T Co.*, 197 F.3d 1276, 1281 (9th Cir. 1999). The attorneys' fees provision of the DTSA provides that "a court may . . . if a claim of [trade secret] misappropriation is made in bad faith . . . award reasonable attorney's fees to

the prevailing party." 18 U.S.C. § 1836(b)(3)(D). Prevailing party status requires that a party "received a judgment on the merits, or obtained a court-ordered consent decree." *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 605 (2001).

Because neither the DTSA nor the UTSA provide a definition of "bad faith" in the context of trade secret misappropriation, courts generally adopt a two-pronged standard for the evaluation of such claims. *See, e.g., Gabriel Techs. Corp. v. Qualcomm Inc.*, No. 08CV1992 AJB MDD, 2013 WL 410103, at *7 (S.D. Cal. Feb. 1, 2013), *aff'd*, 560 F. App'x 966 (Fed. Cir. 2014). The party seeking an award of attorney's fees must show (1) the objective speciousness of opposing party's claim, and (2) the subjective bad faith of the opposing party in bringing or maintaining the action for an improper purpose. *Id.*; *see also CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1111 (9th Cir. 2007).

Objective speciousness may be shown by demonstrating that there was no misappropriation or threatened misappropriation or that the opposing party could not have suffered any economic harm. *Gabriel Techs. Corp.,* 2013 WL 410103 at *7 (finding it obvious from an early point in the litigation that the trade secret misappropriation claims were time-barred). "'Objective speciousness exists where there is a complete lack of evidence supporting Plaintiff's claims.'" *Sun Media Sys., Inc. v. KDSM, LLC*, 587 F. Supp. 2d 1059, 1073 (S.D. Iowa 2008) (quoting *Contract Materials Processing, Inc. v. Kataleuna GmbH Catalysts*, 222 F. Supp. 2d 733, 744 (D. Md. 2002) (quotations and citations omitted)).

The second prong (subjective bad faith) is satisfied when it may be inferred from the evidence that a party "intended to cause unnecessary delay, filed the action to harass [the opposing party], or harbored an improper motive." *Gabriel Techs. Corp.*, 2013 WL 410103, at *7. Subjective bad faith "means the action was commenced or continued for an improper purpose, such as harassment, delay, or to thwart competition." *SASCO v. Rosendin Elec., Inc.*, 143 Cal. Rptr. 3d. 828, 835 (Ct. App. 2012). "That question 'involves a factual inquiry into the plaintiff's subjective state of mind: Did he or she believe the action was valid? What was his or her intent or purpose in pursuing it?'" *Yield Dynamics, Inc. v. Tea Sys. Corp.*, 66 Cal. Rptr. 3d 1, 29 (Ct. App. 2007) (quoting *Gemini Aluminum v. Cal. Custom Shapes*, 116 Cal. Rptr. 2d 358, 369 (Ct. App. 2002) (internal citations omitted)). "Filing a trade-secret action to restrain legitimate competition and job mobility, needless to say, is not proper." *Degussa Admixtures, Inc. v. Burnett*, 277 F. App'x 530, 535–36 (6th Cir. 2008) (awarding fees under Michigan law when evidence showed, not that the plaintiff had an objectively supportable and good-faith claim that the defendant was using trade secrets to gain new customers, but that the plaintiff's "own product-quality, employee-retention and marketing shortcomings led it to file this action in an attempt to slow the bleeding from those self-inflicted wounds—to avoid losing additional market share and salespeople to [the competitor] and to convert [the defendant's] confidentiality agreement into a noncompete agreement.").

Also, "[t]he timing of the action may raise an inference of bad faith." *FLIR Sys. v. Parrish*, 95 Cal. Rptr. 3d 307, 315 (Ct. App. 2009). "Similar inferences may be made where the plaintiff proceeds to trial after the action's fatal shortcomings are revealed by

opposing counsel." *Id.* However, "[t]he absence of evidence alone, even after discovery, does not support a finding of subjective bad faith." *SASCO v. Rosendin Elec., Inc.*, 143 Cal. Rptr. 3d 828, 835 (Ct. App. 2012), *as modified on denial of reh'g* (Aug. 7, 2012). A grant of summary judgment to an opposing party does not establish objective speciousness of a trade secrets claim. *Pixion, Inc. v. PlaceWare Inc.*, No. C 03-02909 SI, 2005 WL 3955890, at *3 (N.D. Cal. Apr. 22, 2005). A plaintiff's decision to maintain its position regarding the adequacy of its trade secret disclosures despite the defendants' evidence otherwise is "hardly evidence of improper motive." *Id.* The judge, as the factfinder in the attorney-fee context, is not required to draw all inferences in favor of the non-moving party but instead is permitted to make factual findings in accordance with his or her own view of the evidence. *Degussa Admixtures, Inc.*, 277 F. App'x at 536.

Under the DTSA, the statute of limitations for asserting a claim is "3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). For purposes of this subsection, a continuing misappropriation constitutes a single claim of misappropriation. *Id.* The DTSA explicitly states that, for the purposes of application of the statute of limitations, a continuing misappropriation is treated as a single claim. *See id.*

There is some authority for the proposition that by treating a continuing violation as a single claim, the statute rejects the "continuing violation" theory, under which continued disclosure or use of a trade secret would permit claims for other misappropriations occurring within the limitations period, even if prior misappropriations

are not actionable, or would permit a claim for all misappropriations so long as one occurred within the limitations period. *CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*, No. 16-CV-33-LRR, 2017 WL 6210920, at *9 (N.D. Iowa Dec. 8, 2017) (holding that the clear intent of both the UTSA and DTSA is that a plaintiff placed on notice that another may be utilizing its trade secrets may not sleep on its rights). There is also authority to the contrary, however. *See, e.g., Adams Arms, LLC v. Unified Weapons Sys., Inc.*, 2016 WL 5391394, *6 (M.D. Fla. Sept. 27, 2016) (stating that the language in Section 2(e) specifying that DTSA applies to "any misappropriation . . . for which any act occurs" after the effective date "suggests that when an 'act' occurs after the effective date, a partial recovery is available on a misappropriation claim.") Notably, "Congress omitted from DTSA the following language from Section 11 of the UTSA: 'With respect to a continuing misappropriation that began prior to the effective date, the [Act] also does not apply to the continuing misappropriation that occurs after the effective date.'" *See Adams Arms, LLC*, 2016 WL 5391394, at *6 (quoting UTSA, § 11).

B.    Discussion

The court finds an award of attorney fees is not warranted in this action. Farmobile has failed to prove either prong of the "bad faith" test. First, contrary to Farmobile's contention, the court did not explicitly find FEI's assertion of the DTSA claim was objectively specious. The court's statement that genuine issues of material fact remained on the issues of subjective intent does not imply that the objective speciousness prong of the test had been met. Further, the court's finding that FEI's DTSA claim was barred does not equate to a finding of objective speciousness.

Also, the DTSA is relatively recent legislation and caselaw interpreting the statute is not well-developed. Though the court found the claim was barred because the alleged disclosures occurred before the enactment of the DTSA, there is some legal and factual support for the proposition that the continuing violation theory may apply to a DTSA claim. If so, the disclosures in Farmobile's later USPTO office actions and/or its conduct in Canadian patent litigation could arguably trigger the application of the continuing violation theory. The court finds the claim is not objectively specious and there is some legal and factual support for a good faith belief by FEI that its claim was viable.

Moreover, FEI's DTSA trade secrets claim arose out of the same set of facts as Nebraska statutory and common law trade secrets claim and, although unsuccessful, those claims were not time-barred or objectively specious. There was a reasonable factual basis for the assertion of the state law trade secrets claims. The close temporal connection between the individual defendants' departure from Crop Ventures and their design and development of a competing product at least suggests trade secret misappropriation. Under the circumstances, the court cannot find FEI's assertion of the DTSA claim was objectively specious.

Further, Farmobile has not shown that FEI asserted the DTSA claim with an improper purpose such as to harass Farmobile, delay proceedings, or thwart competition. As noted above, the evidence and law concerning the time-bar issue is not equivocal, so FEI's failure to dismiss the claim is not unsupportable or unreasonable. Again, the fact that the DTSA claim mirrors FEI's other trade-secret misappropriation claims weighs against a finding of improper purpose. Because the discovery and proof

of the DTSA claim involves the same issues and evidence as the other claims, the assertion of the DTSA claim would not have unnecessarily delayed proceedings.

The fact that FEI and Farmobile are competitors is relevant but not determinative of any improper purpose. It is not improper to seek a competitive advantage. Farmobile has not shown that the purpose of FEI's assertion of the DTSA claim was to give it an *improper* competitive edge. On this record, the court finds that Farmobile has not shown that FEI asserted its trade secret claim for an improper purpose. The DTSA claim was just one of many claims that FEI asserted against Farmobile. The addition of that claim did not make an appreciable difference in the conduct of the litigation. Competitors routinely assert claims against each other for misappropriation of trade secrets— together with other business-related torts such as breach of a covenant not to compete and/or patent infringement—in circumstances like those involved in this case.

The court credits the testimony that Wade Barnes relied on Ron Osborne's knowledge of the facts and circumstances of the individual defendants' leaving Crop Ventures and Osborne's assessments of similarity between work done at Crop Ventures and the patent application in deciding to file the lawsuit. Ron Osborne credibly testified that he subjectively believed the patent application described work done at Crop Ventures. That testimony is consistent with the evidence of the work that Nuss and Heath Gerlock performed at Crop Ventures. At the time the lawsuit and the amended complaint were filed, Barnes's belief that trade secrets had been misappropriated appeared reasonable in view of the timing of events. Though Barnes's reliance on Osborne may have been unwise or misguided, the court does not find his failure to investigate or verify the truth of Osborne's statements amounted to reckless behavior.

Farmobile's reliance on the absence of evidence of any misappropriation of physical documents to show FEI's bad faith is misplaced. Though discovery eventually revealed that no source code had been misappropriated, that fact is not determinative of the entire misappropriation issue. The evaluation of the strength or weakness of FEI's trade secrets claims was dependent on interpretation of conflicting facts and information. Reasonable minds could differ on the definitions of novelty, readily ascertainable information or prior art, notions of ownership and patent concepts that form the basis of the trade secrets claims. This case involved numerous interrelated claims and defenses and the parties discussed, conflated, and invoked complex tangentially-connected patent law concepts on all the claims. In consideration of the number of claims, counterclaims, and defenses that were vigorously and contentiously litigated by the parties, the court does not find FEI's supposed "shape-shifting and ever-evolving trade secret definition" probative of malign intent. Counsel for both parties vigorously represented the parties' respective positions and both contributed to escalation of the cost of litigation in this case.

Though the court granted summary judgment in favor of Farmobile and the individual defendants on the DTSA claim against them, that is a different question than that now before the court. This court's finding that the allegedly misappropriated information was not secret and was known in the industry will undoubtedly be challenged and could well be reversed. The court finds that FEI had a basis for its belief that Farmobile's patent applications disclosed or revealed a method and process that was developed at Crop Ventures and that may have qualified as a trade secret. Farmobile has not shown that FEI actually knew or was reckless in not knowing that its

claim for trade secret misappropriation had no merit. The factual backdrop that led to this lawsuit—the individual defendants left Crop Ventures, formed Farmobile, and then started marketing a product similar to one they had worked on at Crop Ventures— supports assertion of misappropriation of trade secrets claims. Although FEI was not ultimately successful, that fact alone does not establish that it acted in bad faith or engaged in misconduct in bringing and maintaining its claim. Notably, Farmobile was equally aggressive in connection with counterclaims against FEI.

Accordingly, the court finds Farmobile's motion to recover attorney's fees under the DTSA should be denied.

IT IS ORDERED:

1.     Farmobile's claim for attorney fees under the DTSA is dismissed.

2.     A judgment in conformity with this order and with the court's Memorandum and Order on summary judgment will issue this date.

Dated this 7th day of August, 2018.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge